Sandra GARRITY, et al., Plaintiffs, Appellees,

v.

Hugh J. GALLEN, et al., Defendants, Appellees.

Appeal of SALEM SCHOOL DISTRICT, et al.

No. 82–1325.

United States Court of Appeals, First Circuit.

Argued Sept. 16, 1982.

Decided Jan. 10, 1983.

Rehearing Denied Feb. 2, 1983.

See also, D.C., 522 F.Supp. 171.

Gerald M. Zelin, Salem, N.H., with whom Soule, Leslie, Bronstein & Zelin, Salem, N.H., was on brief, for appellants.

Mark L. Gross, Atty., Dept. of Justice, Washington, D.C., with whom W. Stephen Thayer, III, U.S. Atty., Concord, N.H., Wm. Bradford Reynolds, Asst. Atty. Gen., and Jessica Dunsay Silver, Atty., Dept. of Justice, Washington, D.C., were on brief, for appellee U.S.

John D. MacIntosh, Concord, N.H., with whom Richard A. Cohen, Manchester, N.H., was on brief, for Sandra Garrity, et al., plaintiffs, appellees.

Before COFFIN, Chief Judge, DAVIS [*] and BOWNES, Circuit Judges.

OSCAR H. DAVIS, Circuit Judge.

The sole question we need consider is whether the district court abused its discretion in denying as untimely the application of Salem School District, several other school districts, and the New Hampshire School Administrators Association (applicants) to intervene in the main action. Applicants sought intervention of right under Fed.R.Civ.P. 24(a), as well as permissive intervention under Fed.R.Civ.P. 24(b). We hold that the district court did not abuse its discretion in ruling that the attempted intervention was untimely, and therefore affirm.

I.

The principal case has a somewhat protracted history.[1] In April 1978, the first-named plaintiff Sandra Garrity—together with five other developmentally disabled individuals residing at Laconia State School and Training Center (LSS)[2] as well as the

---

[*] Of the Federal Circuit, sitting by designation.

1. The facts are more completely set forth in the district court's main opinion. *Garrity v. Gallen,* 522 F.Supp. 171 (D.N.H.1981).

2. Laconia State School and Training Center (LSS) is the only institution of the State of New Hampshire for the provision of services (including a residential facility) to the mentally retarded.

New Hampshire Association for Retarded Citizens—brought suit in the district court against the Governor of New Hampshire; the Commissioner of the State Department of Education; the Commissioner of the State Department of Health and Welfare; the Director of the Division of Mental Health; the Superintendent of LSS; and several other official defendants. The plaintiffs sought declaratory and injunctive relief against the defendants, predicating their complaint upon 42 U.S.C. § 1983 (1976) and alleging that defendants had violated provisions of the Education for All Handicapped Children Act, 20 U.S.C. § 1400 et seq. (1976 & Supp. IV 1980); the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 et seq. (1976 & Supp. II 1978); and the Rehabilitation Act, 29 U.S.C. § 701 et seq. (1976 & Supp. II 1978).

In November 1978, the United States sought and received leave to intervene as a plaintiff, asserting that defendants had interfered with federal law and policy concerning assistance to developmentally disabled citizens. In February 1980, after extensive discovery, the district court denied defendants' motion to dismiss the United States' complaint in intervention, and certified the case as a class action. The court defined the plaintiffs' class as consisting of all developmentally disabled individuals who were then, or would be in the future, residents at LSS. In addition, the court established a subclass of plaintiffs—persons between the ages of three and twenty-one whose rights under the Education for All Handicapped Children Act (EHCA) may have been violated. See Garrity v. Gallen, 522 F.Supp. 171, 176 (D.N.H.1981).

The trial commenced in April 1980 and continued for over forty days, ending in late June 1980. All parties agree that the trial received extensive media coverage, the district court judicially noting that "scarce-ly a single trial day did not result in at least one article in the only newspaper published in New Hampshire which affords state-wide coverage." Garrity v. Gallen, No. 78–116–D, slip op. at 1 (D.N.H. Jan. 26, 1982) (order).

While the case awaited decision by the district court, the New Hampshire legislature considered, and passed, a "special education" statute, N.H.Rev.Stat.Ann. § 186–C (Supp.1981) (effective July 1981). The legislature designed this measure to be a counterpart to the federal EHCA; in effect, it may be characterized as the state's then attempt to comply with the EHCA mandate that all handicapped children receive a "free and appropriate" public education. See Garrity, supra, 522 F.Supp. at 221. One of the most noteworthy effects of § 186–C was its reallocation of fiscal responsibility for the education of handicapped children. Essentially, the statute placed a ceiling on the amount to be appropriated by the state legislature each year for education of the handicapped. See N.H.Rev.Stat.Ann. § 186–C: 18 (Supp.1981). The Act also required each local school district to bear most of the expense of providing handicapped children who formerly resided in their district (but now live at LSS) with an education that complied with the EHCA. Id. § 186–C: 13 (Supp.1981); see Garrity, supra, 522 F.Supp. at 221–23.

The special education bill was signed by then-Governor Thompson in June 1981, and took effect on July 1, 1981. On August 17 of that year, the district court issued its lengthy opinion. In relevant part, the court concluded that defendants had committed numerous violations of the Rehabilitation Act, and of the EHCA and related state statutes, and directed counsel to draft a plan of implementation, or a consent decree, to provide relief to the plaintiff class. Garrity, supra, 522 F.Supp. at 244.[3]

---

**3.** In its August 17, 1981, decision the court generally ordered defendants to provide plaintiffs between ages three and twenty-one (the subclass) with 5¼ hours of education per day for the school year; to require local school districts (such as applicants) to develop and maintain individual education programs (IEPs) for each member of the plaintiff subclass; and to ensure that the local school districts fulfilled their fiscal responsibilities by contributing their proportionate share of the funds needed to edu-

By order of November 16, 1981, the court approved an implementation plan submitted by defendants, with some substantial modifications. This order was embodied in a "judgment" entered November 25, 1981.

Applicants did not seek intervention until January 25, 1982—two months after district court approval of the implementation plan, over five months after that court's basic opinion, and almost seven months after the effective date of the new New Hampshire special education statute. Under the then view that the district court's final decision had been rendered on November 25, 1981, January 25, 1982 was the last day, under Rule 4(a)(1) of the Federal Rules of Appellate Procedure, for filing a notice of appeal. In fact, several hours after applicants filed their petition to intervene, defendants filed a notice of appeal.[4] The district court denied applicants' intervention petition on January 26, and again on reconsideration on April 2, 1982, finding that the request for intervention was untimely.[5]

## II.

The Federal Rules of Civil Procedure require that intervention—whether "of right" or "permissive"—be timely. *See* Fed.R.Civ.P. 24(a), 24(b). The timeliness requirement was not designed to penalize prospective intervenors for failing to act promptly; rather, it insures that existing parties to the litigation are not prejudiced by the failure of would-be intervenors to act in a timely fashion. *McDonald v. E.J. Lavino Co.,* 430 F.2d 1065, 1074 (5th Cir. 1970) (citing Note, *The Requirement of Timeliness Under Rule 24 of the Federal Rules of Civil Procedure,* 37 Va.L.Rev. 863,

867 (1951)). The determination of timeliness is within the sound discretion of the district court; we cannot disturb the district court's findings on this point unless an abuse of discretion has been demonstrated. *NAACP v. New York,* 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973); *Culbreath v. Dukakis,* 630 F.2d 15, 24 (1st Cir. 1980). And when intervention is sought after approval of a plan of implementation, amounting to a consent decree, a stronger case must be made to justify intervention. *See Alaniz v. Tillie Lewis Foods,* 572 F.2d 657, 659 (9th Cir.) (per curiam), *cert. denied,* 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978). There is a comparable principle for intervention after final judgment. *See United States v. Associated Milk Producers, Inc.,* 534 F.2d 113, 116 (8th Cir.), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976).[6]

In denying leave to intervene, the district court applied the timeliness analysis that this court used in *Culbreath, supra,* 630 F.2d at 20–24. That test considers four factors: (1) the length of time the applicants knew, or reasonably should have known, of their interest before they petitioned to intervene, *id.* at 20; (2) the prejudice to existing parties due to the applicants' failure to petition for intervention promptly, *id.* at 21; (3) the prejudice that applicants would suffer if they were not allowed to intervene, *id.* at 22; and (4) unusual circumstances militating for or against intervention, *id.* at 24.

## III.

As applied to this case, the *Culbreath* factors lead us to conclude that the

---

cate members of the plaintiffs' subclass. *Garrity, supra,* 522 F.Supp. at 240–41.

**4.** It was later determined that that appeal was premature because no final judgment had yet been entered; plaintiffs' application for attorney's fees had yet to be decided. *See infra* note 6. That appeal was dismissed by this court.

**5.** After the district court's initial denial of leave to intervene, it certified the intervention question to this court pursuant to 28 U.S.C. § 1292(b) (1976). This court dismissed applicants' interlocutory appeal and accepted the

present appeal from the final order denying intervention.

**6.** Generally, courts look with some disfavor upon motions to intervene filed after entry of final judgment. *See Associated Milk Producers, supra,* 534 F.2d at 116. The applicants in this case moved to intervene on January 25, 1982; judgment had been entered on November 25, 1981. Although the district court later reopened judgment on February 3, it did so only to consider an award of attorney's fees, not to reconsider the merits of its decision.

court below did not abuse its discretion in determining timeliness, which "is to be determined from all the circumstances." *NAACP v. New York, supra,* 413 U.S. at 366, 93 S.Ct. at 2603.

First, applicants should have known of their interest in the case long before they chose to intervene. Although they claim that they did not have actual knowledge of their interest until December 1981, when they allegedly first learned of the precise terms of the November order of implementation, the extensive media coverage of the trial—coupled with the pleadings, the enactment of the New Hampshire special education statute in June 1981, and the court's decision of August 1981—should have alerted them to the fact that they had an obvious interest in the outcome of the litigation.

The record contains numerous press clippings from several New Hampshire and Massachusetts newspapers detailing instances of media attention from the filing of the complaint through the trial testimony of several witnesses. Many of these articles depicted plaintiffs' suit as an attempt to close LSS—a matter in which applicants say they had little direct interest because it would not bear on their own concern for local education. But the fact is that several of those articles specifically portrayed the litigation as an attempt to place LSS residents in community-based training and education programs. *See, e.g., Manchester Union Leader,* June 12, 1980, at 3; *id.,* April 18, 1980, at 1. Moreover, at least one article implied that the efficacy of the IEPs prepared for individual plaintiffs was an issue in the suit, *see id.,* June 12, 1980, at 3; various state defendants had been attempting to force the local school districts to assume responsibility for IEP preparation for some time. *See Garrity, supra,* 522 F.Supp. at 224–27.

We cannot say that the district court erred in holding that these articles should have alerted the local school districts to their interest in these proceedings. Even if the local school districts actually perceived plaintiffs' effort as merely an attempt to "shut down" LSS, it was reasonable to find

that they should have known that realization of that objective would result in onerous financial responsibilities when the members of the plaintiff subclass returned to their respective communities. The district court properly considered this possibility in its denial of intervention on rehearing. *See Garrity v. Gallen,* No. 78–116–D, slip op. at 2 (D.N.H. April 2, 1982) (order). In sum, the degree of publicity that the suit received, making it an item of widespread public concern in New Hampshire, was so extensive that it is hard to believe that the press coverage should not have alerted appellants to their interest in intervening. *See Michigan Association for Retarded Citizens v. Smith,* 657 F.2d 102, 105 (6th Cir. 1981); *Culbreath, supra,* 630 F.2d at 21.

This conclusion is strengthened by the pleadings in the case, as well as by the special education statute, § 186–C, enacted by the New Hampshire legislature in June 1981. Both the plaintiff class, and the United States as plaintiff-intervenor, based their complaints in large part upon alleged EHCA violations by the state. The state defendants moved to dismiss the EHCA claims and, later, being unsuccessful in that attempt, included EHCA issues in their pretrial statement of issues. All of these filings were, and are, matters of public record, as was the district court's decision of February 22, 1980, certifying a subclass of plaintiffs who alleged EHCA violations. These documents should have played a role in awakening applicants to their interest in possible intervention long before the fall of 1981. *See Smith, supra,* 657 F.2d at 105; *Culbreath, supra,* 630 F.2d at 21.

Even more importantly, the passage of § 186–C should have spurred applicants. As noted in Part I, *supra,* that statute largely shifted financial liability for education of the handicapped from the state, as an entity, to the respective local school districts. *See* N.H.Rev.Stat.Ann. § 186–C: 13, 18 (Supp.1981); *see Garrity, supra,* 522 F.Supp. at 221–23. Despite this increase in the applicants' fiscal responsibility to ensure EHCA compliance, they remained inactive and now say, belatedly, that they chose

to rely on the defendants to represent their interests—even though the enactment of the statute diminished the state's duties under the EHCA.

Applicants even failed to act after the district court issued its decision on August 17, 1981, specifying actions which it requested defendants to take to compel the local school districts' compliance with the EHCA. *See supra* note 3; *Garrity, supra,* 522 F.Supp. at 240–41.

Finally, applicants waited two months after the implementation order of November 1981, which they themselves assert as making their interest crystal clear. By that time, at the very latest, they should have been ready to intervene, but nevertheless they delayed for another two months until almost the last moment. Clearly, the district court could take this additional delay into account in assessing the totality of the circumstances.

Secondly, we must appraise the degree of prejudice suffered by existing parties to the litigation if the applicants were now permitted to participate. Intervention to contest provisions of the implementation order would obviously be highly detrimental to members of the plaintiff class; the substantial relief afforded them by the order would probably be delayed—and, if applicants were successful in their challenge to the order, denied. Courts have not hesitated to give great weight to such potential adverse effects in denying leave to intervene. *See Smith, supra,* 657 F.2d at 105; *Culbreath, supra,* 630 F.2d at 22; *Nevilles v. EEOC,* 511 F.2d 303, 305 (8th Cir.1975) (per curiam). In addition, should the applicants be allowed to intervene, and the suit continue to remain alive in the district court, the state defendants would, to their detriment, be compelled to expend additional public resources in an attempt to defend their stand against the local school districts on one hand and the plaintiffs on the other. Needless to say, the United States, as plaintiff-intervenor, would similarly be forced to duplicate its expenses in efforts to ensure compliance with federal law. It is plain that intervention at this stage would prejudice all existing parties to the litigation. *Cf. Culbreath, supra,* 630 F.2d at 22.

*Culbreath* also calls upon us to examine the potential prejudice that the local school districts might suffer. Applicants invoke this factor because, in their view, they may be bound by the terms of the implementation order; they urge also that they have demonstrated a significant probability of success on the merits with respect to the proper interpretation of the EHCA. These arguments do not persuade us.

It is likely that future attacks the applicants might mount upon the terms of the implementation order may be forestalled to some extent by principles of *res judicata. See Culbreath, supra,* 630 F.2d at 22–23. Nonetheless, the terms of the order merely delineate the procedural safeguards which the state defendants must apply, in their supervisory capacities over the local school districts, to ensure that the plaintiffs receive the benefit of individually tailored IEPs. *See Garrity, supra,* 522 F.Supp. at 221, 240–41. The school districts remain free to challenge their actual obligation to provide specific forms of education and training to each individual plaintiff in future separate administrative and judicial proceedings, as provided by the EHCA. *See* 20 U.S.C. § 1415 (1976). The district court specifically noted this avenue of relief in its order on rehearing of applicants' motion to intervene. *See Garrity v. Gallen,* No. 78–116–D, slip op. at 2–3 (D.N.H. April 2, 1982) (order).

■ Nor are we convinced that applicants enjoy a significant probability of success on the merits. At the best for appellants, their case (as we now see it) is arguable, but not significantly superior to their opponents'. And to the extent they seek to step into the shoes of the defendants for the purposes of appeal *(see infra)*—to contest the district court's interpretation of the EHCA and related statutes—they are confined to those issues raised by the defendants in that court. *Cf. United States v. Drake,* 673 F.2d 15, 19 (1st Cir.1982); *Needleman v. Bohlen,* 602 F.2d 1, 4 (1st Cir. 1979). In their motion to "amend and clari-

fy" the court's implementation order, which was filed concurrently with their motion to intervene, and again in their briefs before us, applicants primarily raise two major questions under the statutes: first, whether some children are so profoundly handicapped that they would not benefit from nor require special education; second, whether training in living skills and related services must accompany any special education provided to plaintiffs under the EHCA. We find no support in the record to indicate that the state defendants raised these issues at trial;[7] even if applicants were to be granted leave to intervene for the purposes of appeal, they would be barred from raising these particular contentions. In short, applicants have shown no more than that they will suffer the possibility of prejudice if intervention is denied; if anything, the balance of prejudice tips in favor of the plaintiffs.

■ Lastly, we see no unusual circumstances warranting intervention. On the other hand, there are circumstances militating against it. The complaint was filed over four and one-half years ago. The implementation order of the trial court is the culmination of extensive discovery, hearings before a magistrate, and a lengthy trial which, taken together, lasted almost two years. The implementation order was proposed, in significant part, by defendants who had carried on the litigation. The intervention of the local school districts at this time would serve only to delay the implementation of that relief and require further allocation of scarce judicial and public resources. This court has found undue delay of relief and undue expenditures of judicial resources to work against intervention, see *Culbreath, supra,* 630 F.2d at 24, and that principle is applicable here.

■ Applicants urge that, at the least, they should be permitted to intervene in order to take and press an appeal, citing the Supreme Court's decision in *United Air-*

*lines, Inc. v. McDonald,* 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977); their contention is that they were entitled to rely on the defendants to advocate their interests at trial and moved to intervene only when it became apparent to them that the state defendants were likely not to protect the local school districts' interests on appeal. *McDonald* is distinguishable for two reasons. First, the intervenor in *McDonald* was a putative class member who intervened solely to appeal an adverse class determination order. That intervenor had every right to rely on the actual class members to represent her interests until final judgment. Here, on the other hand, applicants should have been aware well before judgment—particularly after the enactment of § 186–C (the New Hampshire special education Act) in June 1981, *see* Parts I and III, *supra*—that the state defendants' interests were in large part unaligned with those of the applicants. Second, the intervenor in *McDonald* was not free to appeal the adverse class determination until final judgment was actually entered. *McDonald, supra,* 432 U.S. at 388 n. 4, 394 & n. 15, 97 S.Ct. at 2467 n. 4, 2470 & n. 15. In contrast, the local school districts in this case were free to move to intervene at any point in the proceedings, but chose to wait until the last day of the then filing period for notices of appeal before they petitioned to intervene on January 25, 1982. Their attempted intervention was untimely even if we consider it limited (as it was not in fact) to the taking of an appeal in lieu of the state defendants.

### IV.

We have reviewed the applicants' contentions in the light of the timeliness analysis which this court enunciated in *Culbreath* —an analysis designed "to prevent last minute disruption of painstaking work by the parties and the court." *See Culbreath, supra,* 630 F.2d at 22. The district court did

---

7. As the United States notes in its brief (at 25), the state defendants did not raise these specific issues either in their pre-trial statement of issues or their post-trial brief. Rather, the state focussed primarily on the issue of whether the EHCA requires treatment in "less restrictive" (*i.e.* community) settings than LSS.

not abuse its discretion in denying applicants, at this late stage, the right to intervene, whether that right be considered mandatory or permissive.

*Affirmed.*