Mary Ann FIANDACA, et al.,
Plaintiffs, Appellees,

v.

Michael CUNNINGHAM, etc., et al.,
Defendants, Appellees.

Appeal of NEW HAMPSHIRE ASSOCI-
ATION FOR RETARDED
CITIZENS, et al.

Mary Ann FIANDACA, et al.,
Plaintiffs, Appellees,

v.

Michael CUNNINGHAM, etc., et al.,
Defendants, Appellants.

Nos. 87–1199, 87–1200.

United States Court of Appeals,
First Circuit.

Heard June 4, 1987.

Decided Aug. 25, 1987.

John D. MacIntosh, with whom Epstein, Burke & MacIntosh, P.A., Concord, N.H., was on brief, for appellants N.H. Ass'n for Retarded Citizens.

Ronald F. Rodgers, Sr. Asst. Atty. Gen., with whom Stephen E. Merrill, Atty. Gen., Concord, N.H., was on brief, for Michael Cunningham.

Bertram D. Astles, for appellee Mary Ann Fiandaca.

Before COFFIN, DAVIS * and SELYA, Circuit Judges.

COFFIN, Circuit Judge.

This opinion discusses two consolidated appeals related to a class action brought by twenty-three female prison inmates sentenced to the custody of the warden of the New Hampshire State Prison. The suit challenges the state of New Hampshire's failure to establish a facility for the incarceration of female inmates with programs and services equivalent to those provided to male inmates at the state prison. After a bench trial on the merits, the district court held that the state had violated plaintiffs' right to equal protection of the laws and ordered the construction of a permanent in-state facility for plaintiffs no later than July 1, 1989. It also required the state to provide a temporary facility for plaintiffs on or before November 1, 1987, but prohibited the state from establishing this facility on the grounds of the Laconia State School and Training Center ("Laconia State School" or "LSS"), New Hampshire's lone institution for the care and treatment of mentally retarded citizens.

One set of appellants consists of Michael Cunningham, warden of the New Hampshire State Prison, and various executive branch officials responsible for the operation of the New Hampshire Department of Corrections ("state"). They challenge the district court's refusal to disqualify plaintiffs' class counsel, New Hampshire Legal Assistance ("NHLA"), due to an unresolva-

ble conflict of interest. See N.H. Rules of Professional Conduct, Rule 1.7(b). They also seek to overturn that portion of the district court's decision barring the establishment of an interim facility for female inmates at LSS, arguing that this prohibition is unsupported either by relevant factual findings, see Fed.R.Civ.P. 52(a), or by evidence contained in the record.

The other group of appellants is comprised of the plaintiffs in a separate class action challenging the conditions and practices at the Laconia State School, *Garrity v. Sununu*, No. 78–116–D (D.N.H. filed April 12, 1978),[1] including the New Hampshire Association for Retarded Citizens ("NHARC") and the mentally retarded citizens who currently reside at LSS (the *"Garrity* class"). This group sought unsuccessfully to intervene in the relief phase of the instant litigation after the conclusion of the trial, but prior to the issuance of the court's final memorandum order. See Fed. R.Civ.P. 24. On appeal, these prospective intervenors argue that the district court abused its discretion in denying their motion.

We begin by presenting the relevant facts and then turn to our analysis of the legal issues raised by each of these appeals.

## I. *Factual Setting.*

This case began in June, 1983, when plaintiffs' appellate counsel, Bertram Astles, filed a complaint on behalf of several female inmates sentenced to the custody of the state prison warden and incarcerated at the Rockingham County House of Corrections. NHLA subsequently became co-counsel for plaintiffs and filed an amended complaint expanding the plaintiff class to include all female inmates who are or will be incarcerated in the custody of the warden. In the years that followed, NHLA assumed the role of lead counsel for the

---

* Of the Federal Circuit, sitting by designation.

1. *See Garrity v. Gallen*, 522 F.Supp. 171 (D.N.H. 1981); *see also Garrity v. Sununu*, 752 F.2d 727 (1st Cir.1984) (attorney's fees); *Garrity v. Gal-* *len,* 697 F.2d 452 (1st Cir.1983) (denial of intervention). The district court, Chief Judge Devine, continues to exercise jurisdiction over this matter.

class, engaging in extensive discovery and performing all other legal tasks through the completion of the trial before the district court. Among other things, NHLA attorneys and their trial expert, Dr. Edyth Flynn, twice toured and examined potential facilities at which to house plaintiffs, including buildings at the Laconia State School, the New Hampshire Hospital in Concord, and the Youth Development Center in Manchester.

Pursuant to Fed.R.Civ.P. 68, the state offered to settle the litigation on August 1, 1986, in exchange for the establishment of a facility for female inmates at the current Hillsborough County House of Corrections in Goffstown. The state had already negotiated an agreement with Hillsborough County to lease this facility and expected to have it ready for use by the end of 1989. Plaintiffs rejected this offer, however, primarily because the relief would not be available for over three years and because the plan was contingent on Hillsborough County's ability to complete construction of a new facility for the relocation of its prisoners. Plaintiffs desired an in-state facility within six to nine months at the latest and apparently would not settle for less.

The state extended a second offer of judgment to plaintiffs on October 21, 1986. This offer proposed to establish an in-state facility for the incarceration of female inmates at an existing state building by June 1, 1987. Although the formal offer of judgment did not specify a particular location for this facility, the state informed NHLA that it planned to use the Speare Cottage at the Laconia State School. NHLA, which also represented the plaintiff class in the ongoing *Garrity* litigation, rejected the offer on November 10, stating in part that "plaintiffs do not want to agree to an offer which is against the stated interests of the plaintiffs in the *Garrity* class." The state countered by moving immediately for the disqualification of NHLA as class counsel in the case at bar due to the unresolvable conflict of interest inherent in NHLA's representation of two classes with directly adverse interests. The court, despite recognizing that a conflict of interest probably existed, denied the

state's motion on November 20 because NHLA's disqualification would further delay the trial of an important matter that had been pending for over three years. It began to try the case four days later.

The *Garrity* class filed its motion to intervene on December 11, ten days after the conclusion of the trial on the merits. The group alleged that it had only recently learned of the state's proposal to develop a correctional facility for women at the Laconia State School. The members of the class were concerned that the establishment of this facility at the school's Speare Cottage, which they understood to be the primary building under consideration, would displace 28 residents of the school and violate the remedial orders issued by Chief Judge Devine in *Garrity*, 522 F.Supp. at 239–44, as well as N.H.Rev.Stat. Ann. ch. 171–A. The district court denied the motion to intervene on December 23, assuring the applicant-intervenors that it would "never approve a settlement which in any way disenfranchises patients of LSS or contravenes the letter or intent of [Chief Judge] Devine's order in *Garrity*."

Meanwhile, the court agreed to hold up its decision on the merits pending the conclusion of ongoing settlement negotiations, permitting the principal parties to spend the month of December, 1986, engaged in further efforts to settle the case. Within approximately one week after the conclusion of the trial, the parties reached an understanding with regard to a settlement agreement which called for the establishment of a "fully operational facility at the present site of the Laconia State School for the incarceration of female inmates by November 1, 1987." The agreement also provided that all affected residents of LSS would receive appropriate placements at least two months prior to the opening of the correctional facility. After negotiating this agreement, NHLA moved to withdraw as class co-counsel on December 11 and attorney Astles signed the settlement agreement on plaintiffs' behalf. The state, however, refused to sign the agreement.

This collapse of the post-trial settlement efforts prompted Judge Loughlin, the dis-

trict judge in the instant case, and Chief Judge Devine, the *Garrity* trial judge, to convene a joint settlement conference on December 22, 1986. At this conference, plaintiffs formally withdrew their consent to the original settlement agreement in light of the state's refusal to abide by the agreement. Both parties agreed, nevertheless, to try once again to settle the matter in a manner acceptable to all concerned and to report to the en banc court by January 12, 1987. Judge Loughlin, apparently believing that NHLA's conflict of interest prevented its effective performance as plaintiffs' class counsel, granted NHLA's pending motion to withdraw the day after the joint settlement conference. NHLA, however, had reconsidered its withdrawal from the case in light of the state's failure to sign the settlement agreement and it immediately petitioned the court to be reinstated as class counsel. The court denied the motion for reinstatement, reasoning that the "doctrine of necessity," its purported justification for denying the state's earlier disqualification motion in the face of NHLA's conflict of interest, no longer had force because the case had been tried to a conclusion.

The district court finally announced its decision on the merits on January 13, 1987. Finding that the conditions of confinement, programs, and services available to New Hampshire female prisoners are not on par with the conditions, programs, and services afforded male inmates at the New Hampshire State Prison, the court held that such gender-based, inferior treatment violates the Equal Protection clause of the Fourteenth Amendment. As a primary remedy, it ordered the state to establish "a permanent facility comparable to all of the facilities encompassed at the New Hampshire State Prison ... to be inhabited no later than July 1, 1989." In crafting a temporary remedy, it reiterated that "there shall not be a scintilla of infringement upon the rights and privileges of the *Garrity* class," and proceeded to rule that the state had to provide plaintiffs with "a building comparable to the Speare Building," but that such facility "shall not be located at the Laconia State School or its environs." This appeal resulted.

## II. *Appeal of State Department of Corrections.*

As noted above, the state challenges the district court's decision on two independent grounds. First, it claims that the court should have disqualified NHLA as plaintiffs' class counsel prior to the commencement of the trial. Second, it contends that the court's proscription of the use of a site at the Laconia State School is unsupported either by relevant findings of fact or by evidence contained in the record. Because we find in favor of the state on its first claim and remand for a new trial on the issue of an appropriate remedy, we confine ourselves to an analysis of the disqualification issue.[2]

### A. *Refusal to Disqualify for Conflict of Interest.*

The state's first argument is that the district court erred in permitting NHLA to represent the plaintiff class at trial after its conflict of interest had become apparent. As we recognized in *Kevlik v. Goldstein*, 724 F.2d 844 (1st Cir.1984), a district court is vested with broad power and responsibility to supervise the professional conduct of the attorneys appearing before it. *Id.* at 847. It follows from this premise that "[w]e will not disturb the district court['s] finding unless there is no reasonable basis for the court's determination." *Id.* We must determine, therefore, whether the court's denial of the state's disqualification motion amounts to an abuse of discretion in this instance.

■ The state's theory is that NHLA faced an unresolvable conflict because the interests of two of its clients were directly adverse after the state extended its second offer of judgment on October 21, 1986.

---

2. We note in passing, however, that we have been unable to ascertain findings of fact by the district court sufficient to satisfy the requirements of Rule 52(a) with regard to its ban on the use of LSS. Should the court reach the same result on remand, we expect its opinion to include specific findings that amply support its conclusion.

The relevant portion of New Hampshire's Rules of Professional Conduct[3] states:

A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client ... unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation and with knowledge of the consequences.

.    .    .    .    .

N.H. Rules of Professional Conduct, Rule 1.7(b). The comment to Rule 1.7 prepared by the ABA goes on to state:

Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client.

N.H. Rules of Professional Conduct, Rule 1.7, comment. In this case, it is the state's contention that the court should have disqualified NHLA as class counsel pursuant to Rule 1.7 because, at least with respect to the state's second offer of judgment, NHLA's representation of the plaintiff class in this litigation was materially limited by its responsibilities to the *Garrity* class.

We find considerable merit in this argument. The state's offer to establish a facility for the incarceration of female inmates at the Laconia State School, and to use its "best efforts" to make such a facility available for occupancy by June 1, 1987, presented plaintiffs with a legitimate opportunity to settle a protracted legal dispute on highly favorable terms. As class counsel, NHLA owed plaintiffs a duty of undivided loyalty: it was obligated to present the offer to plaintiffs, to explain its costs and benefits, and to ensure that the offer received full and fair consideration by the members of the class. Beyond all else, NHLA had an ethical duty to prevent its loyalties to other clients from coloring its representation of the plaintiffs in this action and from infringing upon the exercise of its professional judgment and responsibilities.[4]

NHLA, however, also represents the residents of the Laconia State School who are members of the plaintiff class in *Garrity*. Quite understandably, this group vehemently opposes the idea of establishing a correctional facility for female inmates anywhere on the grounds of LSS. As counsel for the *Garrity* class, NHLA had an ethical duty to advance the interests of the class to the fullest possible extent and to oppose any settlement of the instant case that would compromise those interests. In short, the combination of clients and circumstances placed NHLA in the untenable position of being simultaneously obligated to represent vigorously the interests of two conflicting clients. It is inconceivable that NHLA, or any other counsel, could have properly performed the role of "advocate" for both plaintiffs and the *Garrity* class, regardless of its good faith or high intentions. Indeed, this is precisely the sort of situation that Rule 1.7 is designed to prevent.

Plaintiffs argue on appeal that there really was no conflict of interest for NHLA because the state's second offer of judg-

---

**3.** As amended in 1985, Rule 4(d) of the Rules of the United States District Court for the District of New Hampshire provides: "The standards of conduct for all attorneys practicing before this court shall be those which govern the members of the New Hampshire Bar Association as of the time any attorney appears before any judge or magistrate of this court." New Hampshire has recently adopted, with some changes, the ABA's Model Rules of Professional Conduct. *Cf. Kevlik,* 724 F.2d at 846–47 & n. 4 (replacement of Model Code of Professional Responsibility with Model Rules of Professional Conduct).

**4.** The fact that the conflict arose due to the nature of the state's settlement offer, rather than due to the subject matter of the litigation or the parties involved, does not render the ethical implications of NHLA's multiple representation any less troublesome. Among other things, courts have a duty to "ensur[e] that at all stages of litigation ... counsel are as a general rule available to advise each client as to the particular, individualized benefits or costs of a proposed settlement." *Smith v. City of New York,* 611 F.Supp. 1080, 1090 (S.D.N.Y.1985).

ment was unlikely to lead to a completed settlement for reasons other than NHLA's loyalties to the *Garrity* class. We acknowledge that the record contains strong indications that settlement would not have occurred even if plaintiffs had been represented by another counsel. For instance, in ruling on the intervention motion, the district court stated that, pursuant to its duties under Fed.R.Civ.P. 23(e), it would not approve a settlement that infringed in any way on the rights of the LSS residents. Furthermore, as plaintiffs contend, the second offer of judgment was unattractive because it was phrased in "best efforts" language and did not set a firm date for establishment of the facility. The question, however, is not whether the state's second offer of judgment would have resulted in a settlement had plaintiffs' counsel not been encumbered by a conflict of interest. Rather, the inquiry we must make is whether plaintiffs' counsel was able to represent the plaintiff class unaffected by divided loyalties, or as stated in Rule 1.7(b), whether NHLA could have reasonably believed that its representation would not be adversely affected by the conflict. Our review of the record and the history of this litigation—especially NHLA's response to the state's second offer, in which it stated that "plaintiffs do not want to agree to an offer which is against the stated interests of plaintiffs in the *Garrity* case"—persuade us that NHLA's representation of plaintiffs could not escape the adverse effects of NHLA's loyalties to the *Garrity* class.

Both the district court and plaintiffs on appeal have also advanced the belief that "necessity" outweighed the adverse effects of NHLA's conflict of interest in this instance and justified the denial of the state's pre-trial disqualification motion. *See United States v. Will*, 449 U.S. 200, 213–17, 101 S.Ct. 471, 480–82, 66 L.Ed.2d 392 (1980). The district court recognized the probable existence of the conflict as early as November 20, 1986, when it took up the matter of the disqualification motion at an in-chambers hearing. At that time, the court noted that the state's motion had "quite a bit of merit to it," but that it would deny the

motion because the case had already lingered on its docket for approximately three and a half years. The court later identified this balancing of NHLA's conflict of interest against considerations of delay and time pressure as the application of the "doctrine of necessity." The court apparently believed that further delay engendered by a motion to disqualify on the eve of trial, coupled with its own scheduling dilemma, provided a sound basis for ignoring the conflict and proceeding to trial as quickly as possible. It warned plaintiffs' counsel, however, that they should consider the possibility that the trial would be infected by "built-in reversible error."

While it is surely laudable that the court was anxious to resolve a lingering dispute concerning an unfortunate state of affairs, we fail to see how the doctrine of *necessity* is implicated in a case such as this. As plaintiffs' counsel admitted at oral argument, there was no particular emergency at the time of the court's decision to ignore the conflict of interest and proceed to trial. Plaintiffs simply continued to suffer the effects of the same inequitable treatment that had persisted for many years. While it would have been desirable to avoid delaying the trial for up to a year or more, it certainly was not "necessary" in the sense of limiting the court to but one potential course of action. We realize that other courts occasionally consider the possible effects of delay in ruling on disqualification motions, *see, e.g., Laker Airways Ltd. v. Pan American World Airways*, 103 F.R.D. 22, 27–28 (D.D.C.1984) ("Were the motion to disqualify to be granted, the resulting additional delay might well be crippling."), but in this circuit, arguments premised on delay have been less availing. As we held in *Kevlik*, 724 F.2d at 844, "we cannot, in the face of a breach of professional duty, ignore the wrong because appellees' counsel neglected to discern the conflict earlier, *or even opted to delay litigation by raising the motion....*" *Id.* at 848 (emphasis supplied).

Absent some evidence of *true* necessity, we will not permit a meritorious disqualification motion to be denied in the interest of

expediency unless it can be shown that the movant strategically sought disqualification in an effort to advance some improper purpose. Thus, the state's motivation in bringing the motion is not irrelevant; as we recognized in *Kevlik,* "disqualification motions can be tactical in nature, designed to harass opposing counsel." *Id.* However, the mere fact that the state moved for NHLA's disqualification just prior to the commencement of the trial is not, without more, cause for denying its motion. *See id.* There is simply no evidence to support plaintiffs' suggestion that the state "created" the conflict by intentionally offering plaintiffs a building at LSS in an effort "to dodge the bullet again" with regard to its "failure to provide instate housing for the plaintiff class." We do not believe, therefore, that the state's second offer of judgment and subsequent disqualification motion were intended to harass plaintiffs. Rather, our reading of the record indicates that a more benign scenario is more probable: the state made a good faith attempt to accommodate plaintiffs by offering to establish a correctional facility in an existing building at the Laconia State School and, once NHLA's conflict of interest with regard to this offer became apparent, the state moved for NHLA's disqualification to preserve this settlement option.

As we are unable to identify a reasoned basis for the district court's denial of the state's pre-trial motion to disqualify NHLA from serving as plaintiffs' class counsel, we hold that its order amounts to an abuse of discretion and must be reversed.

### B. *Proper Remedy.*

█ In light of the district court's error in ignoring NHLA's conflict of interest, we believe it necessary to remand the case for further proceedings. We must consider a further question, however: must the district court now start from scratch in resolving this dispute? The state argues that the court's failure to disqualify NHLA is plain reversible error, and therefore requires the court to try the matter anew. We subscribe to the view, however, that merely "conducting [a] trial with counsel that should have been disqualified does not 'in-

delibl[y] stamp or taint' the proceedings." *Warpar Manufacturing Corp. v. Ashland Oil, Inc.,* 606 F.Supp. 866, 867 (N.D.Ohio, E.D.1985) (quoting *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 376, 101 S.Ct. 669, 674, 66 L.Ed.2d 571 (1981)). With this in mind, we look to the actual adverse effects caused by the court's error in refusing to disqualify NHLA as class counsel to determine the nature of the proceedings on remand. *Cf. Board of Education of New York v. Nyquist,* 590 F.2d 1241, 1246 (2d Cir.1979) (courts should be hesitant to disqualify an attorney unless trial will be tainted); *Smith v. City of New York,* 611 F.Supp. at 1091–92 (same); *SMI Industries Canada Ltd. v. Caelter Industries, Inc.,* 586 F.Supp. 808, 814 (N.D.N.Y. 1984) (same).

We do not doubt that NHLA's conflict of interest potentially influenced the course of the proceedings in at least one regard: NHLA could not fairly advocate the remedial option—namely, the alternative of settling for a site at the Laconia State School—offered by the state prior to trial. The conflict, therefore, had the potential to ensure that the case would go to trial, a route the state likely wished to avoid by achieving an acceptable settlement. Nevertheless, we do not see how a trial on the merits could have been avoided given the manner in which the case developed below. Judge Loughlin stated on the record that he would not approve a settlement infringing on the rights of LSS residents, and under Rule 23(e), any settlement of this class action required his approval to be effective. It seems to us, therefore, that even if some other counsel had advised plaintiffs to accept the state's offer for a building at LSS, a trial on the merits would have been inevitable.

With respect to the merits of the equal protection issue, the state has been unable to identify any way in which the court's error adversely affected its substantial rights at trial. The state admits that it had long recognized the need to establish an in-state facility for female inmates comparable to the state prison and that it had already taken steps in this direction by

negotiating an agreement for the use of the present Hillsborough County House of Correction beginning in 1989. The evidence adduced at trial confirmed what both parties had known all along—that female state inmates do not enjoy services, programs, and conditions of confinement similar to those afforded the male inmates at the state prison—and this evidence led the court to conclude that the state had violated plaintiffs' right to equal protection of the laws.

The state has not directly challenged any of the district court's findings, which were based on the overwhelming evidence of inequitable treatment, and there has been no suggestion that the proceedings on the merits and the court's holding on the issue of liability were tarnished in any way by NHLA's participation. Indeed, as the state had to concede at oral argument, if the trial had been bifurcated into liability and remedy phases, NHLA's conflict of interest would have tainted its representation of plaintiffs—and required disqualification—only in the second, remedial phase of the trial. It seems plain to us, therefore, that at least with regard to the court's determination on the merits of the equal protection issue, the error in refusing to disqualify NHLA as class counsel is not inconsistent with substantial justice and should not require retrial of this issue. For these reasons, we hold that, with regard to the merits of the case, the district court's failure to disqualify NHLA constitutes harmless error at most, Fed.R.Civ.P. 61, and we affirm the district court's holding that the state violated plaintiffs' rights to equal protection of the laws.

The situation is different, however, with respect to the remedy designed by the district court. We believe that it would be inappropriate to permit the court's remedial order—which includes a specific prohibition on the use of LSS—to stand in light of the court's refusal to disqualify NHLA. The ban on the use of buildings located on the grounds of LSS is exactly the sort of remedy preferred by NHLA's *other* clients, the members of the *Garrity* class, and therefore has at least the appearance of having been tainted by NHLA's conflict of inter-

est. Consequently, we hold that the district court's remedial order must be vacated and the case remanded for a new trial on the issue of the proper remedy for this constitutional deprivation. This determination leads us to the question of which parties should be permitted to participate in this new trial, an issue that forms the heart of the appeal brought by NHARC and the other members of the *Garrity* class as prospective intervenors. We turn, therefore, to the questions these parties raise on appeal.

### III. *Appeal of the Prospective Intervenors.*

The *Garrity* class contends that we should overturn the district court's denial of its motion to intervene in the relief phase of this litigation pursuant to Fed.R. Civ.P. 24. It argues that the court erred in denying its motion without addressing in any way the requirements of Rule 24 or the timeliness criteria for intervention motions set forth in *Culbreath v. Dukakis,* 630 F.2d 15, 20–24 (1st Cir.1980). Although the court may have believed that intervention was unnecessary or would further complicate the case, the prospective intervenors insist that the court overlooked the possibility that its decision barring the use of LSS as a site for the incarceration of female inmates would be overturned, leaving them without formal protection on appeal and before the district court in future proceedings. Again, we must determine whether the district court abused its discretion. *Id.* at 17.

Rule 24 divides intervention into two types. Rule 24(a) concerns "intervention of right" and states that, upon "timely application," the court *"shall"* permit intervention by any applicant who claims an interest related to the subject of the proceedings and who "is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately protected by existing parties." Fed.R.Civ.P. 24(a). Rule 24(b), on the other hand, governs "permissive intervention" and provides that

a court *"may,"* upon "timely application," permit intervention "when an applicant's claim or defense and the main action have a question of law or fact in common," so long as the intervention will not "unduly delay or prejudice the adjudication of the rights of the original parties." Fed.R.Civ.P. 24(b).

We are persuaded that Rule 24(a) properly applies in this instance. It is not disputed that the state's offer to establish a women's correctional facility at the Speare Cottage would lead to the displacement of 28 mentally retarded residents of LSS. Nor is it contested that Chief Judge Devine has ordered that these residents must be afforded services and placements in accordance with their individual service plans ("ISPs"). *Garrity,* 522 F.Supp. at 240–41. The prospective intervenors maintain that the professional staff at LSS, which is charged with the responsibility of formulating these ISPs, has determined that the Speare Cottage is the "least restrictive" setting available for these residents. *Cf. Youngberg v. Romeo,* 457 U.S. 307, 322–23, 102 S.Ct. 2452, 2461–62, 73 L.Ed.2d 28 (1982). They argue, therefore, that to move them from the Speare Cottage would amount to a violation of the district court's orders in *Garrity* and the relevant state statute, N.H.Rev.Stat.Ann. ch. 171–A. In this regard, at least, the disposition of the instant case may impair the *Garrity* plaintiffs' ability to protect their own interests and they should be permitted to intervene as a matter of right, provided they have satisfied the other requirements of Rule 24(a).

Under Rule 24(a), there are only two possible grounds on which the district court could have legitimately denied appellants' motion to intervene. First, it could have found that the interest of the prospective intervenors was adequately represented by the existing parties. In the context of this dispute, however, where both parties negotiated a settlement that would have been contrary to the interest of the prospective intervenors and affirmatively sought to block the attempted intervention, this rationale could not have served as a legitimate

basis for the court's denial of the motion. Nor is it enough that the court itself intended to protect the interests of the *Garrity* class, for the court must remain impartial and detached. Code of Judicial Conduct, Canon 3. Obviously, the court cannot and must not serve as an advocate for the interests of an absent party in this type of situation.

Alternatively, the court could have held that the application for intervention was untimely under the standards established in *Culbreath,* 630 F.2d at 15. This is a closer question, yet, as we shall explain, we do not believe that this theory could have provided a sound basis for the court's decision. It is true that a motion to intervene must be filed in a timely fashion, and that in this case, intervention was sought only after the conclusion of the trial. However, the point to which a suit has progressed, while relevant, is not the dispositive factor in determining timeliness. Rather, "[t]imeliness is to be determined from all the circumstances." *NAACP v. New York,* 413 U.S. 345, 366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648 (1973). Furthermore, several courts have held that the standards of timeliness for a Rule 24(a) motion are less strict than for a Rule 24(b) motion because greater interests are at stake in the former case. *See, e.g., United States v. American Telephone & Telegraph Co.,* 642 F.2d 1285, 1295 (D.C.Cir.1980); *EEOC v. United Airlines, Inc.,* 515 F.2d 946, 949 (7th Cir.1975); *Diaz v. Southern Drilling Corp.,* 427 F.2d 1118, 1126 (5th Cir.), *cert. denied,* 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970). As we have explained, "[t]he purpose of the basic requirement that the application to intervene be timely is to prevent last minute disruption of painstaking work by the parties and the court." *Culbreath,* 630 F.2d at 22.

Here, NHARC and the *Garrity* class seek to intervene only to address the issue of appropriate relief in the instant litigation and only to the extent that such relief might involve the use of a building at the Laconia State School. Applying the four-part test enunciated in *Culbreath,* a step not taken by the district court, we

conclude that a finding that their application was untimely would amount to an abuse of discretion. *Culbreath* requires us to consider four related factors: (1) the length of time the applicants knew, or reasonably should have known, of their interest before they petitioned to intervene, *id.* at 20; (2) the prejudice to existing parties due to applicants' failure to petition for intervention promptly, *id.* at 21; (3) the prejudice that applicants would suffer if they were not allowed to intervene, *id.* at 22; and (4) any unusual circumstances militating either for or against intervention, *id.* at 24.

As for the first factor—the promptness of applicants' motion—we begin by noting that the members of the *Garrity* class had no inherent interest in the merits of the instant litigation at the outset. Their interest in these proceedings arose rather late in the day, and only as a matter of chance due to the state's proposal, on the eve of trial, to settle its dispute with the female prisoners by establishing a correctional facility at LSS. Specifically, the *Garrity* plaintiffs filed their motion to intervene on December 11, 1986, ten days after the district court ceased taking evidence at trial, but over a month before the court actually issued its final memorandum order. They were not informed that LSS was being considered as a potential site for a women's prison until late October, approximately one week after the state communicated to plaintiffs' counsel its second offer of judgment (which did not explicitly mention LSS). Moreover, it was not until late November or early December that they learned of the post-trial settlement agreement, later abandoned, that actually named LSS as the site of a new state facility for the incarceration of female inmates. They filed their motion to intervene just a few days later.

We believe that the relatively prompt action taken by the *Garrity* class was timely under the requirements of Rule 24. Unlike the would-be intervenors in *Culbreath,* who waited four years after the initiation of the action to seek intervenor status and challenge a submitted consent decree, the members of the *Garrity* class filed their motion soon after learning that their interests may be affected and prior to the court's approval of a settlement or entry of judgment. *Culbreath,* 630 F.2d at 20. These same facts also distinguish the *Garrity* class from the parties who attempted to intervene at an earlier stage of the *Garrity* litigation. *See Garrity v. Gallen,* 697 F.2d 452 (1st Cir.1983). Unlike those parties, who sought intervenor status several months after the conclusion of the trial and entry of judgment, the *Garrity* class—given its initial disinterest in the instant litigation, the sequence in which events unfolded, and its gradually growing awareness that its interests may be implicated in the outcome of the case—cannot be said to have delayed too long prior to initiating its efforts to intervene.

The issue of prejudice to the existing litigants, the second factor we must consider, is perhaps the most important. As we have stated: "[t]he timeliness requirement was not designed to penalize prospective intervenors for failing to act promptly; rather, it insures that existing parties to the litigation are not prejudiced by the failure of would-be intervenors to act in a timely fashion." *Id.* at 455. At the time appellants sought to intervene, the parties had already completed an eight-day trial and were in the midst of settlement negotiations that produced an agreement to establish a correctional facility at LSS. The prospective intervenors had no interest in the liability question, which was the principal focus of the trial, and sought to participate only to address the possible use of LSS as a prison site that was then being discussed in earnest by the parties. Obviously, the attempt by the *Garrity* class to intervene may well have interfered with or even interrupted the post-trial settlement process that was then underway, thus prejudicing the parties who had invested significant amounts of time, money, and effort in an attempt to compose their differences. However, the option of settling the dispute with the establishment of a facility at LSS evaporated of its own accord within days when representatives of the state refused to accede to the proposed settlement agree-

ment. It is doubtful, moreover, that such an option was ever practically available to the parties because of the court's statement that it would not approve a settlement of this nature. From these facts, we can only conclude that permission for the *Garrity* class to intervene after the conclusion of the trial would not have prejudiced either of the parties to this litigation in any manner.

Nor would there be any prejudice to the existing litigants if the *Garrity* plaintiffs were permitted to intervene in the proceedings to be held on remand. At this point, the liability issue has already been resolved in plaintiffs' favor and the new trial will focus solely on the proper remedy owed to the members of the plaintiff class. The state conceded at oral argument that it would not be opposed to intervention by the *Garrity* class on remand, and plaintiffs have cited no reasons for suspecting that they would be prejudiced by such intervention. We conclude, therefore, that neither of the existing parties will be unduly prejudiced by a decision to overturn the district court's denial of the motion to intervene.

The third factor we must consider is whether the *Garrity* class was prejudiced by the court's failure to grant its motion to intervene. Despite Judge Loughlin's solemn promise that he would never enter an order that compromised the interest of these prospective intervenors, we believe that the denial of the motion left the *Garrity* class at significant risk of being prejudiced by the outcome of the litigation. As Judge Loughlin perceptively noted before trial, the case was probably doomed by "built-in reversible error," and so was likely to be reversed and remanded. The court's decision to deny the intervention motion, therefore, ensured that the *Garrity* class would lack formal and adequate means by which to protect its interest when the case went up on appeal and was subsequently remanded. The interests of the *Garrity* class members were not sufficiently protected because, despite the likelihood of reversal, they could rely only on Judge Loughlin's personal assurance that *he* would not compromise their interests.

Finally, we must consider any unusual circumstances militating either for or against intervention. The parties opposing the motion to intervene have failed to identify any circumstances weighing against intervention here. We believe, however, that there is at least one very important factor, previously unmentioned, that tends to tip the balance in favor of intervention. One of the asserted flaws with regard to the district court's original decision in this matter is that there were insufficient factual findings, and even insufficient evidence in the record, to support a ban on use of the Laconia State School as a site for a women's prison. This shortcoming could have been easily remedied by permitting the *Garrity* class to intervene and to introduce evidence as to why the use of LSS would violate Chief Judge Devine's orders in *Garrity*, 522 F.Supp. at 239–44, or be undesirable in other respects. We therefore believe that all concerned would have benefitted from the participation of the *Garrity* class in proceedings before the district court and that this factor should have weighed heavily in favor of the motion's timeliness.

For all these reasons, we hold that the district court abused its discretion in denying the post-trial motion of the *Garrity* class members to intervene in the relief phase of the instant litigation. On remand, these parties shall be permitted to intervene and participate in the proceedings to the fullest extent.

*The judgment of the district court with regard to the violation of plaintiffs' right to equal protection of the laws is affirmed. The remedial order of the district court is vacated and remanded for proceedings consistent with this opinion. The order of the district court denying appellants' motion to intervene is reversed. Each of the parties shall bear its own costs.*