**BANCO POPULAR de PUERTO RICO, Plaintiff, Appellee,**

v.

**David GREENBLATT, et al., Defendants, Appellees.**

**The Official Secured Creditors' Committee of Amfesco Industries, Inc., etc., Intervenor, Appellant.**

**No. 91–2088.**

United States Court of Appeals, First Circuit.

Heard March 4, 1992.

Decided May 13, 1992.

Gabriel B. Schwartz, New York City, with whom Jorge R. Jimenez, San Juan, P.R., Anthony C. Acampora, and Hahn & Hessen, New York City, were on brief, for intervenor, appellant.

Elihu Inselbuch, Caplin & Drysdale, Chartered, Washington, D.C., and Diaz Ascencio, Lopez & Orsini, San Juan, P.R., on brief, for plaintiff, appellee.

Stuart A. Summit, with whom Summit Solomon & Feldesman, New York City, Sanchez–Betances & Sifre, Hato Rey, P.R., Curtis C. Mechling, Stroock & Stroock & Lavan, New York City, and O'Neill & Borges, Hato Rey, P.R., were on brief, for defendants, appellees.

Before SELYA, Circuit Judge, FEINBERG,* Senior Circuit Judge, and CYR, Circuit Judge.

SELYA, Circuit Judge.

The Official Secured Creditors' Committee of Amfesco Industries, Inc. sought to intervene in this case for the purpose of modifying a protective order entered as part of the final judgment. The district court refused to allow intervention. We affirm.

* Of the Second Circuit, sitting by designation.

## I. BACKGROUND

This appeal is a tale of two lawsuits, both rising from the rubble of Amfesco's collapse. In late 1985, Amfesco entered bankruptcy in the Eastern District of New York. The bankruptcy court constituted an Official Secured Creditors' Committee and appointed Irving Trust Company, Chemical Bank, and Banco Popular de Puerto Rico as members of it. On November 18, 1987, the Committee sued Amfesco's former directors in a New York state court. Some seven weeks earlier, however, Banco Popular, acting to its own behoof, had sued Amfesco's former directors and accountants in the United States District Court for the District of Puerto Rico.

The two cases were spun from much the same yarn. The federal action alleged fraud, negligence, and civil conspiracy; the state action alleged waste and mismanagement. An insurer provided counsel for the directors in both forums, acting pursuant to a liability policy purchased by Amfesco in its salad days. Because the policy was a corporate asset, the bankruptcy court enjoined the insurer from disbursing the policy's avails without prior bankruptcy court approval.

On September 9, 1988, the parties to the federal action entered into a confidentiality agreement providing, *inter alia*, that any person producing discovery material (the "Designating Party") could classify the information as "confidential," thus restricting its dissemination to individuals directly involved in the litigation. The agreement also provided for judicial review of interparty disputes anent classification. The district court sanctioned the confidentiality agreement, embodying it in a protective order. Paragraph ten of the protective order stipulated that:

Promptly after final termination of this action, each party or other person subject to the terms hereof shall assemble and destroy or return to the Designating Party all material, documents and things in his or its possession or control designated as Confidential Information by any other party, as well as all copies, summaries, and abstracts thereof, and all other materials, memoranda or documents, constituting or containing information designated as Confidential Information and not subsequently relieved of that designation by the Designating Party or by a court. If such material, documents, or things are destroyed, the person shall certify their destruction to the Designating Party in writing. The [nondisclosure] provisions of this Stipulation ... shall continue after the conclusion of this action until such time as the parties may otherwise agree in writing.

In April 1989, following protracted discovery, the director-defendants sought the bankruptcy court's permission to use insurance monies for settlement of the federal action. On May 1, the Committee filed a motion beseeching the bankruptcy judge to condition approval of the directors' application on a requirement that the settling parties share the fruits of their federal-court discovery with the Committee. The bankruptcy judge, hesitant about fiddling with another tribunal's protective order, granted the directors' application but stayed disbursement of the needed funds for sixty days (during which period the Committee, if it so desired, might have asked the Puerto Rico federal district court to modify the protective order). The Committee made no overtures to the district court. After the sixty-day grace period had passed, the district court, unaware of the Committee's misgivings, entered the settlement agreement as a final judgment. The judgment expressly reaffirmed the protective order.

Some three weeks thereafter (on August 10, 1989, to be exact), the Committee moved to intervene in the federal action for the purpose of enjoining the destruction of discovery documents. All parties to the federal action objected. The district court pondered the motion for over two years.[1] On September 6, 1991, the court finally heard oral argument.

---

1. During this period, one of Amfesco's directors, David Greenblatt, died. Greenblatt had earlier been deposed in the federal action.

The objectors (appellees before us) urged that intervention should be denied for four reasons: (1) the motion was untimely; (2) the Committee had no standing to intervene; (3) the court lacked authority to grant the relief requested; and (4) modification of the protective order would undermine the settlement. Five days later, the district court ruled. The court stated that it lacked authority to impose "new, affirmative requirements" on the appellees after the underlying litigation had been concluded. Accordingly, the court denied the application for intervention without addressing appellees' other asseverations. This appeal ensued.

## II. DISCUSSION

The matter of when, and under what circumstances, a protective order may be lifted at the insistence of a nonparty after entry of final judgment is a complicated one. It is unnecessary for us to meet that issue head-on. After all, an appellate court is not wedded to the district court's reasoning but, instead, can affirm a judgment on any independently sufficient ground reflected in the record, see, e.g., *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48–49 (1st Cir.1990); *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 860–61 (1st Cir.1987); and in cases of this stripe there is a prevenient question: timeliness stands as a sentinel at the gates whenever intervention is requested and opposed.[2] Here, the temporal inquiry is dispositive.

We have made it pellucidly clear that Rule 24's timeliness requirement is of great importance. *See Caterino v. Barry*, 922 F.2d 37, 40 (1st Cir.1990); *United Nuclear Corp. v. Cannon*, 696 F.2d 141, 143 (1st Cir.1982); *see also NAACP v. New York*, 413 U.S. 345, 365, 93 S.Ct. 2591, 2602, 37 L.Ed.2d 648 (1973). When, as here, the district court fails to make an explicit timeliness determination, the court of appeals can nevertheless do so, provided that the record is adequately developed. *See, e.g., Fiandaca v. Cunningham*, 827 F.2d 825, 832–35 (1st Cir.1987) (conducting a timeliness analysis, "a step not taken by the district court," in deciding that the court erred in denying intervention).[3] In this case, we are well positioned to conduct the inquiry *ab initio:* the record is ample to allow an independent timeliness determination; the parties have briefed and argued the point; and the Rule 24 motion was pending before the district court, without resolution, for over two years—a circumstance which makes the further delay that remand would entail particularly rebarbative.

There is no bright-line rule delineating when a motion to intervene is or is not timeous. Instead, courts must decide the question on a case by case basis, examining the totality of the relevant circumstances. *See NAACP*, 413 U.S. at 366, 93 S.Ct. at 2603; *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 784 (1st Cir. 1988), *cert. denied*, 488 U.S. 1030, 109 S.Ct. 838, 102 L.Ed.2d 970 (1989); *Culbreath v.*

**2.** The Committee moved for intervention as of right and permissively, citing both Fed.R.Civ.P. 24(a) and (b). While both of these sections are subject to the precondition that an application for intervention be "timely," we have written that "the standards of timeliness for a Rule 24(a) motion are less strict than for a Rule 24(b) motion because greater interests are at stake in the former case." *Fiandaca v. Cunningham*, 827 F.2d 825, 833 (1st Cir.1987). Since the Committee has furnished us with no developed argumentation on this point, and since we find that the Committee's application was untimely under either section of Rule 24, we see no reason to probe the distinction more deeply. We note, however, that other courts have differed as to which section of the rule governs when a nonparty seeks to intervene for the purpose of modifying a protective order that insulates discovery

materials. *Compare, e.g., United States v. Kentucky Utils. Co.*, 927 F.2d 252, 255 (6th Cir.1991) (analyzing attempt at intervention under Rule 24(a)) *with, e.g., United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir.1990) (analyzing attempt at intervention under Rule 24(b)), *cert. denied*, —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991).

**3..** The trial court here made no explicit finding on timeliness, although it suggested in dictum that appellant had an arguably valid position on this, and other, issues. Had the trial court made a finding on timeliness, we would review that determination for abuse of discretion. *See NAACP*, 413 U.S. at 366, 93 S.Ct. at 2603; *Culbreath v. Dukakis*, 630 F.2d 15, 17 (1st Cir.1980).

*Dukakis,* 630 F.2d 15, 17 (1st Cir.1980). One highly relevant circumstance implicates the status of the case at the time when intervention is attempted. *See Fiandaca,* 827 F.2d at 833. The more advanced the litigation, the more searching the scrutiny which the motion must withstand. *Cf. Garrity v. Gallen,* 697 F.2d 452, 455 n. 6 (1st Cir.1983) (commenting that courts ordinarily "look with some disfavor upon motions to intervene filed after entry of final judgment").

▮ In this circuit, four factors—all of which are informed to some degree by the case's posture—must be considered in ruling on the timeliness of a motion to intervene: (1) the length of time the applicant knew or reasonably should have known that its interest was imperilled before it moved to intervene; (2) the foreseeable prejudice to existing parties if intervention is granted; (3) the foreseeable prejudice to the applicant if intervention is denied; and (4) idiocratic circumstances which, fairly viewed, militate for or against intervention. *See Public Citizen,* 858 F.2d at 785–87; *Fiandaca,* 827 F.2d at 834; *Culbreath,* 630 F.2d at 20–25. We will examine these factors *seriatim.*

▮ 1. *Knowledge.* The first factor focuses on actual or constructive knowledge of possible jeopardy. While knowledge of the existence of litigation, simpliciter, does not invariably trigger one's obligation to seek intervention, the count begins no later than the time "when the intervenor became aware that its interest in the case would no longer be adequately protected by the [existing] parties." *Public Citizen,* 858 F.2d at 785. This does not mean, however, that a potential intervenor can sit idly by and await the receipt of infinitely precise information about every ramification of a pending case. Complete knowledge is unlikely to be attained short of final judgment. Leaving aside constructive knowledge for the time being, the law

contemplates that a party must move to protect its interest no later than when it gains some actual knowledge that a measurable risk exists. *Culbreath,* 630 F.2d at 21; *Alaniz v. Tillie Lewis Foods,* 572 F.2d 657, 659 (9th Cir.) (per curiam), *cert. denied,* 439 U.S. 837, 99 S.Ct. 123, 58 L.Ed.2d 134 (1978).

▮ Once a potential intervenor has acquired such knowledge, the tempo of the count accelerates. The applicant must then act reasonably promptly. *See United Airlines, Inc. v. McDonald,* 432 U.S. 385, 394, 97 S.Ct. 2464, 2469, 53 L.Ed.2d 423 (1977); *United States v. South Bend Community School Corp.,* 710 F.2d 394, 396 (7th Cir. 1983), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1707, 80 L.Ed.2d 181 (1984). Promptness is a concept, not a constant—and the concept is inevitably informed by the attendant circumstances. It should come as no surprise, therefore, that courts have historically viewed post-judgment intervention with a jaundiced eye in situations where the applicant had a reasonable basis for knowing, before final judgment, that its interest was at risk. *See, e.g., United States v. United States Steel Corp.,* 548 F.2d 1232, 1235 (5th Cir.1977).

The knowledge factor cuts rather sharply against the Committee. At least by May 1, 1989, when it asked the bankruptcy court to modify the protective order, the Committee was fully aware of the potential hazards and likely consequences of inaction.[4] The bankruptcy court gave the Committee a generous opportunity to challenge the protective order prior to the entry of final judgment. The Committee squandered this opportunity, waiting until after the protective order was embodied in a final judgment before attempting to intervene in the federal action. We find the Committee's failure to act for over three months, though armed with full knowledge, to be inexpiable. *Compare, e.g., NAACP,* 413 U.S. at 367–68, 93 S.Ct. at 2603–04 (motion untimely where applicant procrastinated

4. It seems highly probable that the Committee should have known of the protective order, and its dangers, well before May 1, 1989. We need not explore the incidence and effect of constructive knowledge, however, for even assuming

that the Committee's earlier knowledge was somehow imperfect, it nonetheless slept upon its rights in a thoroughly inexcusable fashion once it possessed actual knowledge.

for eighteen days); *FTC v. American Legal Distribs., Inc.*, 890 F.2d 363, 365 (11th Cir.1989) (per curiam) (same; delay of two months).

■ 2. *Prejudice to Appellees.* The second prong of the test focuses on whether the delay in seeking intervention prejudiced the existing parties. This is a vital element of a timeliness inquiry. *See Fiandaca*, 827 F.2d at 834.

As a general rule, prejudice to existing parties is less likely in a case where post-judgment intervention does not seek to disturb the core judgment, but merely to reconfigure an ancillary term. *See Caterino*, 922 F.2d at 41; *Public Citizen*, 858 F.2d at 786. Even then, however, post-judgment intervention can beget prejudice to existing parties. "[T]he purpose of the basic requirement that the application to intervene be timely is to prevent last minute disruption of painstaking work by the parties and the court." *Culbreath*, 630 F.2d at 22. Prior to settlement, litigants often negotiate the terms of their conciliation with zeal and, sometimes, with ferocity. If a putative intervenor acts seasonably to contest a prospective settlement term, the existing parties can make an informed decision about whether to continue their attempt to strike a bargain, for they would be on notice that certain settlement provisions might have to withstand the intervenor's challenge. Delaying the intervention attempt until after final judgment robs litigants of this flexibility and can thus prejudice "parties who ... invested significant amounts of time, money, and effort in an attempt to compose their differences." *Fiandaca*, 827 F.2d at 834.

Prejudice can inhere in other respects as well. Once settlement efforts are completed and embodied in a final judgment, the parties expect to be able to tailor their future actions and decisions in reliance on that judgment. It follows inexorably that modifying a settlement term can knock the props out from under justifiable reliance of this sort. Moreover, courts have long recognized the systemic benefits of policies favoring the voluntary resolution of disputes. *See United States v. Cannons*

*Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir.1990); *Culbreath*, 630 F.2d at 22. Sneak attacks on the terms of a fully consummated settlement disserve these salutary policies, undermining the finality of judicial decrees and depriving the original litigants of choices that were theirs to make.

These considerations have obvious pertinence here, leading us to believe that post-judgment intervention would circumvent the settlement and cause unfair prejudice to the appellees.

■ 3. *Prejudice to Appellant.* The penultimate factor in the four-part test focuses on what prejudice an applicant will suffer if intervention is denied. This requires that we determine whether the movant, had intervention been allowed, would have "enjoy[ed] a significant probability of success on the merits." *Garrity*, 697 F.2d at 457; *see also Culbreath*, 630 F.2d at 23; *United States v. Yonkers Bd. of Educ.*, 902 F.2d 213, 219 (2d Cir.1990). Because we see little chance that the Committee could have succeeded in obtaining a broad modification of the protective order, we conclude that this prong of the test also cuts in appellees' favor.

This case does not involve a right of public access, based either on the First Amendment or the common law, to records and documents filed with the district court, *compare, e.g., Littlejohn v. BIC Corp.*, 851 F.2d 673, 677–78 (3d Cir.1988); *Anderson v. Cryovac, Inc.*, 805 F.2d 1, 10–13 (1st Cir.1986); *Bank of Am. Nat'l Trust & Savings Ass'n v. Hotel Rittenhouse Assocs.*, 800 F.2d 339, 343–44 (3d Cir.1986), for the discovery materials at issue here are in the appellees' hands, not in the Clerk's Office. Nor does this case involve a party bound by a protective order who, if the order were modified, would voluntarily circulate the discovered information to third parties. *Compare, e.g., Public Citizen*, 858 F.2d at 777, 780; *Wilk v. American Medical Ass'n*, 635 F.2d 1295, 1297 (7th Cir.1980). Rather, the Committee, a nonparty, contends that it has an entitlement to discovery information gathered and held by others sufficient to warrant modification of a protective order prohibit-

ing the dissemination of that information, notwithstanding that none of the existing parties wishes to share the data. Without more, the law simply does not grant a right of access to a nonparty in such circumstances.

In *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), the Court stated that "pretrial depositions and interrogatories are not public components of a civil trial. Such proceedings were not open to the public at common law, and, in general, they are conducted in private as a matter of modern practice." *Id.* at 33, 104 S.Ct. at 2207–08 (citation omitted); *see also Gannett Co. v. DePasquale*, 443 U.S. 368, 396, 99 S.Ct. 2898, 2913, 61 L.Ed.2d 608 (1979) (Burger, C.J., concurring) ("[I]t has never occurred to anyone, so far as I am aware, that a pretrial deposition or pretrial interrogatories were other than wholly private to the litigants. A pretrial deposition does not become part of a 'trial' until and unless the contents of the deposition are offered in evidence."). We, too, have held that, ordinarily, there is no right of public access to documents dredged up in the course of civil discovery if those documents have not become part of the court record. *Anderson*, 805 F.2d at 10–13; *accord In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 355 (11th Cir.1987) (per curiam) (rejecting claimed right of access "to information collected through discovery which is not a matter of public record"); *Oklahoma Hosp. Ass'n v. Oklahoma Publishing Co.*, 748 F.2d 1421, 1424 (10th Cir.1984) (holding that litigants, as a rule, cannot "be compelled to disseminate [discovered] information"), *cert. denied,* 473 U.S. 905, 105 S.Ct. 3528, 87 L.Ed.2d 652 (1985). When parties possessing discovered information do not desire to disseminate it, "the public has no right to demand access to discovery materials which are solely in the hands of private party litigants." *Public Citizen,* 858 F.2d at 780.

Because the Committee stands little chance of modifying the protective order in any meaningful sense,[5] denying intervention does little to prejudice the Committee's cause.

 *4. Exceptional Circumstances.* The last prong of the test necessitates consideration of unusual features militating in favor of, or against, intervention. Here, the balance is unaffected. Although the Committee will undoubtedly suffer some inconvenience and expense in order to recreate the desired data, it has shown no more. Inconvenience and expense are altogether ordinary concomitants of the pretrial discovery pavane. Given that the state action is a garden variety tort suit, implicating parochial concerns, so modest a burden is not enough to tip the scales.

In treating the state action as prosaic, it is important to note what this case does *not* involve. First, there is no basis for any claim that the state action touches upon matters of broad societal import or that an overriding public interest will be served by modifying the protective order. *Cf., e.g., Public Citizen,* 858 F.2d at 787 (citing "strong public interest" in documents concerning the relationship between cigarette smoking and lung cancer, "an important public health issue"); *Agent Orange,* 821 F.2d at 148 (citing "enormous public interest in the Agent Orange litigation and the compelling need for class members and non-class members alike to evaluate fully the efficacy of settling th[e] litigation"). Second, this case does not involve a total ban on access. We have located no evidence that the Committee lacks the resources or wherewithal to conduct its own discovery. The Committee, then, is

---

**5.** It is, of course, possible that, under certain circumstances, the public may enjoy a right of access to discovery materials held in the reluctant hands of private parties based on Fed. R.Civ.P. 5(d) in conjunction with Fed.R.Civ.P. 26(c). *See In re "Agent Orange" Product Liability Litig.,* 821 F.2d 139, 145–47 (2d Cir.), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987). The Committee has, however, launched no such contention. In view of our settled rule that theories neither briefed nor argued are deemed waived, *see Ryan v. Royal Ins. Co.,* 916 F.2d 731, 734 (1st Cir.1990); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir.), *cert. denied,* 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990), we leave this inquiry for another day.

**1234**

free to use New York's elaborate panoply of pretrial discovery devices to repastinate the same material that was previously unearthed in the federal action.[6]

Finally, we reject the hypothesis that self-initiated discovery would necessarily be futile. The protective order does not provide that all discovery materials gathered in the federal action are to be destroyed; neither the persons who solicited information during discovery nor the persons who produced the information are under any compulsion to atomize original records. By the same token, the protective order in no way purports to immunize the Designating Parties (who, presumably, now hold whatever materials are still in existence) from state-court discovery orders.

A slightly different situation may obtain with regard to the deposition previously taken from the decedent, David Greenblatt. Yet, the Committee has not limited its application to this one identifiable needle but has sought relief affecting a vast haystack of discovery materials. What is more, it has not shown a clear need for *a federal court order* respecting even the Greenblatt deposition. Under the terms of the protective order, the party that designated the deposition transcript as "confidential" is not disabled from producing it if directed to do so by a New York state court. Thus, the Committee may seek the transcript by means of discovery in the state action.[7]

## III. CONCLUSION

We need go no further. On this record, it seems inequitable to allow a latecomer, who fiddled while Rome burned, to collect a share of the fire insurance. Given appellant's unrelieved tardiness and the absence of any mitigating circumstances, we decline

to disturb the district court's denial of post-judgment intervention.

*Affirmed.*

---

6. The existence of this alternative bolsters our conclusion, *see supra* Part II(3), that the Committee will not suffer significant prejudice from the denial of its attempt at intervention. *See Garrity*, 697 F.2d at 457.

7. While we leave all questions regarding the discoverability of information in the state action for adjudication by the state courts, *see United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1428 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991); *Superior Oil Co. v. American Petrofina Co.*, 785 F.2d 130, 130 (5th Cir.1986) (per curiam), we have no basis for anticipating, on the present record, that the Committee will prove unable to secure the Greenblatt transcript through New York's discovery mechanisms.