**PEDIATRICIANS, INC.,**
Plaintiff, Appellee,

v.

**PROVIDENT LIFE & ACCIDENT INSURANCE CO.,** Defendant, Appellant.

**PEDIATRICIANS, INC.,**
Plaintiff, Appellant,

v.

**PROVIDENT LIFE & ACCIDENT INSURANCE CO.,** Defendant, Appellee.

Nos. 91–2103, 91–2129.

United States Court of Appeals, First Circuit.

Heard April 10, 1992.

Decided May 15, 1992.

Rehearing Denied June 12, 1992.

Edward S. Rooney, Jr. with whom Lyne, Woodworth & Evarts, Boston, Mass., was on brief, for Provident Life & Acc. Ins. Co.

Thomas P. LaFrance with whom John Kenneth Felter and Goodwin, Procter & Hoar, Boston, Mass., were on brief, for Pediatricians, Inc.

Before SELYA, Circuit Judge, CAMPBELL, Senior Circuit Judge, and KEETON,* District Judge.

KEETON, District Judge.

The present cross-appeals involve a dispute over life insurance coverage. Pursuant to a Certificate of Insurance on the life of Dr. Thomas A. Flaherty under a group insurance policy issued to the American Medical Association Group Insurance Trust by defendant Provident Life & Accident Insurance Company ("Provident"), Provident paid insurance proceeds to Flaherty's beneficiary, plaintiff Pediatricians, Inc. ("Pediatricians"), in the amount of $100,-000.00.

Pediatricians sued to recover an additional $100,000.00, claiming that the coverage amount at the time of Flaherty's death was $200,000.00. The court below entered summary judgment for Pediatricians on its coverage claim.

Pediatricians also contends that it is entitled to attorney's fees, costs, and double or treble damages under Mass.Gen.L. c. 176D

---

* Of the District of Massachusetts, sitting by designation.

and 93A. After a hearing conducted September 17, 1991, the district court denied plaintiff's claim for relief on that count of its complaint. Final Judgment was entered September 20, 1991.

Provident now appeals the award of additional death benefits; Pediatricians cross-appeals the denial of attorney's fees, costs, and multiple damages. We affirm.

## I. Background

The material historical facts are not in dispute. We summarize them briefly and for context identify uncertainties about the timing of some events.

In 1973, Flaherty obtained life insurance from Provident in the amount of $25,000.00, naming his wife as beneficiary. During the next fifteen years he amended his coverage several times. Of significance to this litigation, he eventually increased the amount to $200,000.00 and changed his beneficiary to Pediatricians (a corporation operating a medical clinic), of which he was president and 50% shareholder. A semi-annual premium came due on September 1, 1988. The amount of this premium was $598.50 (the "semi-annual renewal premium" of $855 less a "premium credit" under the terms of the Group Policy of $256.50).

It is undisputed that in 1988 Marsh and McLennan Group Associates ("Marsh") regularly issued renewal premium notices to AMA members who were certificate holders and also received payments from them. The record before us does not specify either when this practice commenced or how it was authorized. (An application in the record, however, signed by Flaherty on March 2, 1973, has a printed statement, "The program is Administered by [Marsh].")

In the period August 1988—February 1989, nine events (or sets of events) of interest in this litigation occurred. As the following description discloses, however, the precise timing is not certain in all instances. Some overlapping in time among some of these events is probable.

1. *Notice of Renewal Premium due September 1, 1988.* In or before August 1988, Marsh sent to Flaherty a notice that a renewal premium of $598.50 for $200,000 of coverage under the Flaherty Certificate was due September 1, 1988.

2. *Tender of $299.25 payment.* A Pediatricians' check, signed by Donald J. Annino, dated August 31, 1988, and payable to Marsh was mailed in a Pediatricians' envelope, postmarked September 3, 1988 and addressed to Marsh and McLennan Group Associates, 222 So. Riverside, Chicago, ILL, 60606. Also in the envelope was a note in the handwriting of Flaherty and signed by him, stating,

> To Whom It May Concern:
>
> Please reduce my coverage on Term Life Insurance from $200,000 to $100,000. The enclosed premium for $299.25 is forwarded herewith.
>
> /s/ Thomas A. Flaherty, M.D.

> Plan 1104 AMA

> Certificate No. 503722

Marsh received the envelope and enclosures on September 7, 1988.

3. *Dr. Flaherty's entry to hospital.* At some time on September 19 or 20, 1988, Flaherty was admitted to New England Medical Center with a diagnosis of "sepsis" and "septic arthritis." He remained there until his death.

4. *Tender of $598.50 payment.* A check of $598.50, signed by Donald J. Annino, dated September 23, 1988, and payable to Marsh was mailed to Marsh on an undetermined date and received on an undetermined date.

5. *Dr. Flaherty's death.* Dr. Flaherty died at 4:21 a.m., September 29, 1988, from "cardiac arrest" incident to "sepsis" and "septic arthritis."

6. *Reminder Notice.* A machine-generated Reminder Notice, not dated, addressed to Flaherty at 955 Main Street, Winchester, MA 01840 was sent by Marsh and delivered by mail to that address. The Reminder Notice states, "Make check payable to: Marsh and McLennan Group Associates, P.O. Box 2204, Bedford Park, IL 60499-2204," "Total Amount Due $299.25," and "Coverage description: $200,000 Member Life Insurance." The Reminder Notice

carries the legend "Final Notice" and declares, "Your coverage will lapse unless we receive your payment in our office postmarked no later than October 7, 1988." At the bottom is the following additional information:

| | |
|---|---|
| Semi-annual Renewal Premium | $855.00 |
| Less credit balance | 299.25 |
| Premium credit | 256.50 |
| Total premium due | 299.25 |

The top line of this notice reads: "REMINDER NOTICE. IF PAYMENT HAS BEEN MADE, PLEASE DISREGARD." The record is silent as to precisely when the Notice was mailed and when delivered.

7. *Notice of Reduction of Coverage to $100,000.* In an envelope postmarked October 5, 1988, Marsh sent a machine-generated notice bearing a date of 09/29/88, addressed to Thomas A. Flaherty, M.D., 955 Main St., Winchester, MA 01890, and saying, "Please be advised that as requested we have reduced your benefit to $100,000. Your check for $299.25 has been applied to your account and you are currently paid to 3-1-89 . . . ."

8. *Refund.* By check dated November 15, 1988, payable to "Thomas A. Flaherty, M.D., 955 Main St., Winchester, MA 01840," Marsh attempted to tender a refund in the amount of $799.56, together with an attachment showing the word "deceased" under the printed heading, "Explanation of Refund." Marsh's address, printed on the check, is 222 S. Riverside Plaza, Chicago, Illinois 60606.

9. *Provident's Tender of $100,000.* Provident tendered a payment of $100,000 by check dated February 24, 1989, payable to "Pediatricians, Inc., 175 Washington Street, Winchester, MA 01840." The check was enclosed in an envelope with a letter reciting that it represented "Group Life Benefits due . . . for the death of Thomas Anthony Flaherty, which occurred on December 29, 1988," and that "Dr. Flaherty reduced his Life Insurance to $100,000 on September 1, 1988." The voucher attached to the check, however, stated the "DATE OF LOSS" as "September 29, 1988."

After these events, several exchanges took place between Provident and Pediatricians. Pediatricians asserted that the policy coverage was $200,000.00 and requested a copy of the "subject Life Insurance Policy" as well as documentation of the reason for the decrease in coverage. Provident forwarded to Pediatricians copies of Flaherty's Certificate of Insurance, August 31 check, and September 1 note, among other documents. Provident did not send a copy of the Group Policy. In a subsequent phone call, Pediatricians informed Provident that the full premium had been paid after the September 1 note. Provident responded, however, that in its opinion a premium refund (which had been made) was the appropriate remedy because Flaherty's request for reduction in coverage was effective upon receipt of his note and the $299.25 payment. Eventually, Pediatricians sent a demand letter under c. 93A. Provident's in-house counsel responded that Provident's position was that Pediatricians had no authority to increase Flaherty's coverage. This lawsuit followed.

## II. Policy Amount

The district court granted Pediatricians' motion for summary judgment on Count I of the complaint, concluding that at the time of Flaherty's death his life was insured for $200,000.00. The district court reasoned that under either Massachusetts law (which Pediatricians contends is controlling on the issue), *Benoit v. Fisher,* 341 Mass. 386, 169 N.E.2d 905 (1960), or the law of Tennessee (which Provident contends is controlling under a choice-of-law provision in the Group Policy), *Allstate Ins. Co. v. First of Ga. Ins. Co.,* 753 S.W.2d 672 (Tenn.1988), Flaherty's reduction in coverage was not effective until the insurer took some affirmative action. Although Marsh negotiated Flaherty's initial premium check for $299.25 before Flaherty's death, it placed a qualified endorsement on the back of the check indicating that its action was not an acceptance of any offer to purchase insurance. The district court found that Provident took no relevant affirmative action until after Flaherty's death at 4:21 a.m. on September 29. The conclusion that neither Provident nor Marsh took action to acknowledge a reduction of coverage is

supported also by the fact that the Marsh "Reminder Notice," issued before Marsh was aware of Flaherty's death, treated the $299.25 check not as an accepted premium "payment," but as creating a "credit balance" reducing the "total premium due" to $299.25.

We may affirm the judgment of the district court on any independently sufficient ground. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 7 (1st Cir.1990). Because we conclude for the reasons stated below that the coverage at the time of Flaherty's death was $200,000.00, we need not consider and do not decide whether Provident's failure to take some affirmative step might have been outcome determinative.

We conclude, as did the district court, that we need not resolve the parties' dispute over applicable choice of law. Under the terms of the insurance contract and settled principles of contract law that we apply to this case—on which the laws of Massachusetts and Tennessee do not differ—the district court's decision must be affirmed.

### A. *Grace Period*

■ Because no renewal premium was tendered on or before the due date of September 1, 1988, any claim of coverage under the terms of the Group Policy and the Flaherty Certificate arises under the terms of the Grace Period provisions. The Certificate of Insurance (in a provision that is in all material respects like that of the Group Policy) provides:

> A Grace Period of thirty-one days from the date [the premium is] due will be granted to the Insured Member for the payment of any premium after the Initial Premium, during which Grace Period insurance under the Group Policy shall continue in force unless the Insured Member has given the Company written notice of discontinuance of further payment of premiums in advance of the premium due date.

Flaherty sent his written note to Marsh, not to Provident. Provident contends, nevertheless, that Flaherty's notice satis-

fied the written notice requirement of the "Grace Period" clause and effected a reduction of coverage to $100,000. We conclude, to the contrary, that $200,000 of coverage remained in effect until Flaherty's death.

Under either a literal interpretation or a more probing analysis of the Grace Period provision, the undisputed facts demonstrate that the "unless" clause was not satisfied in this case, in two independent respects.

1. First, this is not a case in which "the Insured Member [Flaherty] ha[d] given written notice ... *in advance of the premium due date.*" (Emphasis added).

Grace Period provisions are neither prescribed by law nor closely regulated. They are not uniform. The insurance law of both Massachusetts and Tennessee, as well as that of other states generally, permits insurance companies to compete in the marketing of life insurance with respect to policy terms as well as price. Some companies sometimes choose to offer Grace Period coverage on terms that say nothing about a notice of discontinuance in advance of the premium due date. Provident, however, chose in this instance to offer this Group Policy to the AMA Group Insurance Trust and AMA members on the basis that unless "notice of discontinuance" is received in advance of the due date, coverage continues for the full amount of a Certificate to the end of the Grace Period.

In the marketplace, this provision is attractive to potential insureds. For example, it ensures the insurability of the Insured Member for the Grace Period, and it extends credit for that period on terms that are generous and forgiving. No interest accrues on the credit, and even the principal is forgiven for those Members who live through the Grace Period and allow the coverage to lapse.

To the company also, the Grace Period provision has advantages. For example, the enticement tends to hold a Member in the fold at least temporarily and to give the company and its representatives a chance to persuade the member to pay the premium and continue coverage for another peri-

od. Also, the declaration that this coverage is not available if the Insured Member has given "notice of discontinuance" before the due date may serve as a screening mechanism. The enticement is not offered to the unlikely prospects who have already made up their minds to buy replacement coverage from a competitor or simply to drop this coverage without replacing it.

For these and other reasons that might influence the shaping of Grace Period provisions, the "unless" clause is in fact not arbitrary, freakish, or unconscionable. It can be explained on a reasoned basis to insurance regulatory authorities, to representatives of potential groups during marketing, or to a court. It is legally permissible.

It is true that Grace Period provisions having these terms produce some consequences that, viewed in isolation, may appear strange and undesirable. For example, there is premium inequity between the Insured Members who pay regularly, receiving six months of coverage for a six-month premium, and those who get six months plus, for a six-month premium. Also, there is adverse selection (because a hospitalized Insured Member has a stronger incentive to pay before the Grace Period runs out than does a hale and hearty Insured Member). This can be viewed as a disadvantage not only to the company, but as well to those Insured Members who are the better risks. Marginal consequences of these kinds, however, are characteristic of all grace periods. No state outlaws grace periods because of such consequences. They are a tolerable price to pay for the advantages of grace periods.

The cases Provident cites in support of its contention that Flaherty's note was effective to reduce coverage immediately are not in point. Only two of those cases analyze insurance policies with relevant grace period provisions, and neither of those policies appears to have contained a clause, such as that involved in the instant case, stating, "insurance ... shall continue in force unless the Insured Member has given the Company written notice of discontin-

uance of further payment of premium in advance of the premium due date."

Under this provision, Flaherty had 31 days from September 1 in which to make his payment. Provident contends that only Flaherty could make the payment and that, under a stipulation between the parties, we must accept that Flaherty's steady intent was to reduce coverage. Thus, it is asserted, Pediatricians' payment of $598.50 is irrelevant because Pediatricians was a revocable beneficiary without any vested rights and without any authorization from the insured to make payment.

We conclude, nevertheless, that the Grace Period saves Pediatricians. Not only did Flaherty have 31 days to pay his premium, his full coverage continued in effect during the grace period under the policy provision. That period was set to expire on October 2; Flaherty died September 29. His death fixed the liability of Provident to Flaherty's designated beneficiary in the amount of $200,000.00.

2. The second respect in which the "unless" clause of the Grace Period provision was not satisfied is that this is not a case in which "the Insured Member [Flaherty] ha[d] given *the Company* written notice of discontinuance...."

This condition was not satisfied literally because Flaherty sent his note not to the Company [Provident] but to Marsh. We probe more deeply, however, because Provident contends that notice to Marsh was notice to the Company.

A notice to Marsh constitutes a notice to the Company (Provident) that may have the legal effect of reducing the coverage to $100,000 only if Marsh had authority, actual or apparent, to receive a notice having that legal effect. Provident faces the dilemma that each of its arguments for such authority in Marsh proves either too little or too much.

### B. *Agency Authority*

Authority and apparent authority in the group insurance context, as elsewhere in the law, are most commonly analyzed as incidents of a principal-agent relationship. If Provident attempts to pursue that

course, it must show that Marsh was its agent to receive the "written notice of discontinuance." In the context of an undisputed practice, in which all interested parties acquiesced, under which Insured Members sent premiums to Marsh and Marsh received and accounted to Provident for them, if Provident succeeds in showing that Marsh was Provident's agent to receive the written notice of discontinuance, Provident will also have established at least apparent authority, and probably actual authority as well, to do other things for the Company that an officer of the Company might have done if confronted with the unusual circumstances of a 50 percent premium payment accompanied by a note from the Insured Member saying "[p]lease reduce my coverage from $200,000 to $100,000." The Company might simply agree to the Insured Member's request or it might instead elect to extend its Grace Period strategy to this wavering certificate holder by responding, "We could just end your extra coverage now, as you have requested, but just in case a little extra time will help you, we are continuing your full $200,000 coverage in effect through the Grace Period and for a few days more. You may pay the remainder of the premium at any time before October 7." Authority, or at the least apparent authority (and we need not decide which) to act in this way for the principal is incidental to the authority to receive and account for premiums and to receive a Notice of Discontinuance. If Marsh was Provident's authorized agent for receipt of notice (a conclusion we need not reach, and therefore neither accept nor reject), Marsh's authority extended also to the authority (actual—whether express, implied, or inherent—or apparent)—see *Restatement (Second) of Agency* §§ 7, 8, 8A (1958) to issue responses, at least within the sphere of activity of premium processing. No precedent has been cited by counsel, and we are aware of none, indicating that Massachusetts or Tennessee law is to the contrary. In short, if Provident were to establish Marsh's agency in order to get the benefit of the "notice of discontinuance," it would in turn suffer the burden of Marsh's agency authority to issue the

"Reminder Notice." That notice, though inviting Flaherty to disregard it if payment had been made, offered continued $200,000 coverage conditioned on an additional $299.25 payment on or before October 7. Significantly, that notice was issued after receipt by Marsh of the $299.25 payment and the handwritten note. Thus, even if, as Provident contends and contrary to the district court's conclusion, the amount of coverage was without further action automatically reduced to $100,000 upon receipt by Marsh of Flaherty's note, Marsh's election would then have the effect of restoring coverage to $200,000, conditioned only on payment of the remainder of the premium. The death of Flaherty on September 29 matured the obligation of paying $200,-000, before the end of the period for tender of the remainder of the premium.

Conversely, if Provident cannot show that Marsh was its agent to receive a notice of discontinuance, any argument by Provident based on agency theory fails.

#### C. *Nonagency Authority*

In reality, on the record before us, agency theory does not appear apt. This is not a relationship in which Provident either had or purported to exercise rights of direction and control that a principal has over the agent in a principal-agent relationship. *See id.* § 14.

Instead, this was a multi-party, contractual, risk-allocation relationship among Provident, the AMA Group Insurance Trust, Marsh, Flaherty, other Insured Members, Pediatricians, and other beneficiaries paying premiums with the knowledge and acquiescence of Insured Members. Flaherty's consent to Pediatricians' payment by the August 31 check is evidenced by Flaherty's sending that check with his note of September 1 in the envelope postmarked September 3. The main features of this multi-party contractual arrangement were set forth in documents in evidence in this case, in other documents not in evidence, and in understandings and practices only partly in evidence in this record. Full exploration of this relationship might lead to a finding or conclusion

that Marsh occupied a relationship not of agent for Provident or of dual agent for Provident and Insured Members, but of a fiduciary with power to administer the collection, crediting, and accounting for premiums, binding all parties to the consequences of its actions in doing so.

Provident is free, of course, to contend that Marsh, though not Provident's agent to receive and account for premiums and to receive a notice of discontinuance, was nevertheless authorized by the terms of the multi-party contractual arrangement among all the parties to receive a notice of discontinuance binding upon *the Company* (Provident). Again, however, any argument Provident uses to advance this theory will prove either too little (failing to show such authority in which event the notice of discontinuance was ineffective and the Grace Period coverage of $200,000 continued until Flaherty's death), or too much (showing not only such authority but, as well, incidental authority to respond with the kind of response Marsh made in this case, binding the Company to an election to continue the coverage through the Grace Period and perhaps even a few days beyond, to October 7, 1988).

Were it not for Provident's facing this insoluble dilemma, it would be necessary for us to consider disputable issues about the scope of Marsh's authority to bind Provident, and perhaps to remand for a fuller development of the record and for factfindings bearing upon that authority, under agency principles or otherwise. In view of the insoluble dilemma facing Provident, we need not and do not address these questions.

■ The obligation to pay $200,000, having arisen at the moment of death, is not affected by any subsequent tender of premium or refund. Even if, under the terms of the Group Policy and Certificate, Provident might have a claim against Flaherty's estate for the remainder of the premium, nonpayment would not be a defense to Provident's obligation to pay the $200,000 death benefit to Pediatricians unless perhaps to the extent of an offset equal to the amount remaining due as renewal premium for coverage beyond the due date of September 1. No issue regarding such a claim or offset is before us in this appeal. We need not decide disputes regarding the possible effect of Pediatricians' tender of $598.50 and Provident's refund of $799.56.

### III. Unfair Settlement Practices

Pediatricians cross-appeals the decision of the district court denying Pediatricians relief on Count II of its complaint under c. 176D and 93A. Pediatricians does not contest the district court's subsidiary findings. It contends, however, that the district court's "ultimate findings" are not entitled to deference and that, based on the court's subsidiary findings, its ultimate finding that Provident did not engage in an unfair settlement practice must be reversed. We reject this contention.

The district court adopted, with a few modifications, the subsidiary findings proposed by the parties. Judge Skinner then announced:

> As an ultimate finding of fact, I find that the defendant did not engage in an unfair settlement practice. I find that there was some substantial justification for its position and that the various deficiencies alleged represent some bureaucratic inefficiency and a misunderstanding of what I, at least, have found to be the applicable law. But in my view the evidence does not sustain the finding that this was an unfair practice or that there was an intention to deceive or to deny the plaintiff the rights to which it was entitled under the policy.

Pediatricians focuses on the district court's finding that Provident had no intention to deceive. It correctly notes that no such intention is required for liability. *Equitable Life Assurance Soc'y v. Porter-Englehart*, 867 F.2d 79, 89 (1st Cir.1989). Pediatricians argues that the court therefore committed an error of law. We reject this argument also; it disregards the disjunctive language in the district court's findings.

In addition to finding no intention to deceive or to deny the plaintiff rights to which it was entitled, the court also found

that there was no unfair settlement practice. That finding must be upheld unless clearly erroneous. *See Peckham v. Continental Casualty Ins. Co.*, 895 F.2d 830 (1st Cir.1990) (applying clearly erroneous standard of review to ultimate findings under c. 93A). It was not. In explaining our conclusion, we address Pediatricians' objections seriatim.

■ First, Pediatricians asserts that Provident violated Mass.Gen.L. c. 176D, § 3(9)(d), by refusing to pay the claim "without conducting a reasonable investigation based upon all available information," *id.* Pediatricians informed Provident that the full premium payment had been made, but Provident took no action to confirm that fact. The district court found, however, that Provident denied coverage based principally on a determination that Flaherty had paid a premium in an amount appropriate for $100,000.00 coverage.

Section 3(9)(d) requires only *reasonable* investigation. Provident drew a conclusion, which the district court found not unreasonable, that the payment of the full premium was not effective because (a) it was made by a revocable beneficiary rather than the insured, and (b) it followed after the insured's express written request to reduce coverage. Pediatricians contends that a reasonable investigation should have included an investigation of later payment of an additional amount as premium. The district court also found, however, that Provident relied on the handwritten note. Provident reasoned that the later full premium payment was irrelevant to the coverage question. A reasonable investigator need not necessarily investigate that which it considers irrelevant. Indeed, we did not rely on the later premium payment in concluding above that the coverage amount was $200,000.00 at the time of Flaherty's death, and we concluded for that reason that we need not remand for a factfinding on the effect of that payment.

■ Second, Pediatricians claims that Provident violated § 3(9)(n) by "[f]ailing to provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement." In its response to Pediatricians' c. 93A demand letter, Provident, in part, stated:

> [T]he *grace period provision* is inapplicable to the claim at hand. Had no premium at all been sent by the expiration of the grace period and had Dr. Flaherty not expressed unequivocally his desire to reduce his coverage, his death during the grace period would have entitled your client to $200,000. However, those contingencies did occur and your client is merely entitled to the $100,000 previously tendered but refused. (Emphasis ours).

In view of Provident's stated position that the coverage was governed in a straightforward manner by Flaherty's own unequivocal handwritten request, we conclude that § 3(9)(n) as applied to the facts of this case does not pose a particularly stringent requirement. The district court found that Provident's response letter containing the above-quoted language was sufficient. Its finding is not clearly erroneous.

■ Finally, Pediatricians contends that Provident's failure to provide a copy of the Group Policy, when asked to produce the "subject Life Insurance Policy," was a violation of §§ 3(1) and 3(9)(a) & (f). The district court supportably found that Provident's failure was not a violation. First, the district court could supportably have inferred that Alberta Webb, the claims specialist handling Pediatricians' request for the policy, understood the phrase "subject Life Insurance Policy" to refer to the Certificate of Insurance that had been issued to Flaherty rather than the Group Policy that he had never seen. Although the Certificate of Insurance specifically referred to the Group Policy, Pediatricians never subsequently requested a copy of the Group Policy before commencing litigation. Webb testified that if she had understood Pediatricians' request to include the Group Policy she would have provided a copy. Moreover, Provident did not rely on the Group Policy in denying full coverage, and Provident's in-house counsel testified that he believed the terms of the Group Policy

were inapplicable. The terms of coverage we have determined to be decisive appear in the Certificate and are consistent with corresponding provisions in the Group Policy.

■ Seeking leverage for its claims, Pediatricians argues that liability under c. 176D need not be predicated on a finding that an insurer improperly denied coverage, and that liability may attach even if the insurer's decision to deny coverage ultimately is upheld. This argument fails to take account of the inverse point. Liability under c. 176D and 93A does not attach merely because an insurer concludes that it has no liability under an insurance policy and that conclusion is ultimately determined to have been erroneous.

## CONCLUSION

The judgment of the district court is affirmed. Each party shall bear its own costs on appeal.

## ORDER

The Opinion of May 15, 1992 explains our reasons for affirming the judgment of the district court in two consolidated appeals. Defendant Provident Life & Accident Insurance Company ("Provident") now petitions the Court for rehearing in No. 91–2103. In 91–2103, we affirmed the judgment of the district court on the basis of a grace period provision contained in the Certificate of Insurance issued to the insured. We also held that if Flaherty's handwritten note expressing a desire to reduce coverage to $100,000 was binding on Provident, so too was a Reminder Notice issued by the group plan administrator that purported to continue Flaherty's coverage at $200,000 until a date after his death. Provident objects to each ground of decision.

## I.

We address as an initial matter Provident's objection that we inappropriately relied upon the grace period provision and Reminder Notice as grounds of decision because those bases for decision were "not briefed or argued by the parties either in the district court or in this court," Pet. for Reh'g at 2. This assertion disregards colloquies between the court and counsel at oral argument of this appeal, and more significantly disregards the well settled rule that the appellate court may affirm the judgment of the district court on any independently sufficient ground. *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 7 (1st Cir.1990); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48–49 (1st Cir.1990); *Polyplastics, Inc. v. Transconex, Inc.*, 827 F.2d 859, 860–61 (1st Cir.1987); *Banco Popular de Puerto Rico v. Greenblatt*, 964 F.2d 1227, —— (1st Cir.1992).

## II.

In any event, we have considered the arguments Provident now makes in its petition for rehearing and find them wanting. Provident, posing two hypothetical situations in which it contends the court's holding leads to an absurd and inequitable result, extrapolates from our Opinion a conclusion that we neither expressed nor implied. We concluded that the grace period provision of the policy (which states that during a thirty-one day grace period for payment of premium due, the policy "shall continue in force unless the Insured Member has given the Company written notice of discontinuance of further payment of premiums *in advance of the premium due date*") keeps full coverage in effect during the grace period when the only "written notice[s]" relied upon were sent after the premium due date. We did not conclude, as Provident mistakenly asserts, that if a request for reduction in coverage is made after the premium due date then at the expiration of the grace period all coverage lapses. Indeed, there would be no inconsistency between our decision and a decision either way as to whether the proposed policy reduction goes into effect at the end of the grace period, leaving the insured covered thereafter in the lower amount stated in his untimely request. We did not and do not decide this hypothetical question. Also we did not hold, as Provident imagines, that Flaherty would not have

been covered at all had he died after the expiration of the grace period, nor did we hold that Flaherty would have had to wait until the next premium due date to reduce his coverage had he lived. No such issues were or are before us.

 Provident contends also that our unwillingness to acknowledge the significance of Flaherty's stipulated intent has led us to err. Provident cites numerous authorities to the effect that the parties may by mutual agreement (or "mutual consent" or "by consent of the parties" as the terms are variously used) modify a contract term such as a grace period provision. Provident contends that Flaherty's note is evidence that the parties nullified the grace period provision. The district court concluded, however, that Provident took no relevant action with respect to Flaherty's note until after his death, and Provident does not now contend otherwise. Thus, there is evidence only of Flaherty's intent, not of any *mutual* agreement of the parties.

 Moreover, any argument that Flaherty waived the terms of the grace period provision is unsupported by the evidence. We accept Provident's position that Flaherty intended to reduce his coverage; nevertheless, there is no evidence that Flaherty knew of, and intended to waive, the benefits accorded him under the grace period provision. Although an inference may be drawn that Flaherty wished to reduce his insurance premium, this fact is not enough to support a further inference that he was aware of the cost-free benefit of continuing full coverage afforded him during the grace period and that he manifested an intent not to accept that benefit. The want of evidence sufficient to support a finding of waiver is fatal to Provident's assertion of waiver.

Provident argues that we applied the grace period provision to a situation for which it was never intended. That argument was considered and addressed in our Opinion. Simply put, not all grace period provisions are like the one at issue in this case. As we stated in our Opinion, cases that do not contain the language "in ad-vance of the premium due date" are inapposite. Decisions saying broadly that grace periods do not apply to extend coverage beyond the date insurance is terminated by request cannot reasonably be read as declaring unenforceable an explicit term, such as appears in the grace period provision in this case, unequivocally stating that the grace period provision applies despite a request for termination unless the request is made in advance of the premium due date.

### III.

We conclude that Provident's contention that we inappropriately relied upon the Reminder Notice issued by the plan administrator is without merit as well. Provident argues that the Reminder Notice formed no part of the "summary judgment record" for the appeal in 91–2103, but became part of the appellate record only through the consolidation with the appeal in No. 91–2119 (relating to an issue of liability for unfair insurance practices).

Even if we were to assume (and we do not so hold) in appellant's favor that the appellate record may be separated into a "summary judgment record" and a "consumer protection record," it would make no sense to remand the case for the finding of further facts (unspecified by Provident, and not shown to be material) merely because a document that reinforces the showing that there is no genuine dispute of material fact has come to our attention through consolidation of the two appeals. Remand in these circumstances would inevitably lead to the same end result, but only after delay and wasteful expense.

Provident's effort to explain the Reminder Notice by reference to a second (later) notice issued on September 29 fails, as does Provident's contention that we "totally ignored the effect of the September 29 notice confirming that coverage was reduced, suggesting that the Court is selectively, and unfairly, considering the evidence." Rather than "ignor[ing]" its effect, however, we concluded that the later notice had no effect relevant to disposition of this

case. Flaherty died on September 29 before Provident issued the later notice. Anything that Provident did after Flaherty's death did not affect the coverage he had at the moment of death.

The petition for rehearing is denied.

So ordered.